BONAIRE DEVELOPMENT COMPANY, A CALIFORNIA CORPORATION, SUCCESSOR BY MERGER TO BRANJON, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4396–69.     Filed May 14, 1981.

*Harry Margolis*, for the petitioner.
*Henry E. O'Neill*, for the respondent.

## OPINION

SCOTT, *Judge*: Respondent has determined that petitioner is liable as transferee of the assets of Branjon, Inc., which, in turn, was transferee of the assets of N & V Realty Corp., for a deficiency in the Federal income tax of N & V Realty Corp. for the taxable year 1964 in the amount of $3,748.01. Petitioner admitted in its amended petition that it is the transferee of the assets of N & V Realty Corp. and Branjon, Inc.[1] The issues for

---

[1] In its petition, petitioner alleged that "Petitioner admits that it is transferee of N & V Realty Corporation," and in his answer, respondent admitted this allegation. In its amended petition, petitioner alleged that "Bonaire Development Company is therefore the proper petitioner and acknowledges the jurisdiction of the Court and the responsibility it has as

decision are: (1) Whether a cash basis corporation recognizes income to the extent of fees paid for management services to be rendered for the remainder of the year following its liquidation and distribution of the property to which the services relate; and (2) whether the depreciation recapture provisions apply to a liquidating corporation and, if so, the correct amount of such recapture.

All of the facts have been stipulated and are found accordingly.

Bonaire Development Co. (Bonaire or petitioner) is a corporation organized under the laws of California, and its address was Ojai, Calif., at the time of the filing of the petition in this case. N & V Realty Corp. (N & V), the taxpayer against which the deficiency was levied, filed its return for the taxable year 1964 with the District Director of Internal Revenue, Los Angeles, Calif.

N & V was incorporated on April 15, 1963, by Simon and Mina Lazarus (Lazarus), husband and wife, under the laws of California. N & V filed its Federal income tax returns on the cash basis method of accounting and it was a calendar year taxpayer. Subsequently, Lazarus transferred a shopping center (Fox shopping center), including the Fox Markets building, to N & V in exchange for all issued shares of stock of the company. The exchange was a nontaxable exchange under section 351, I.R.C. 1954.[2]

The development of this shopping center began in 1955, when Lazarus purchased, along with three associates, an 18-acre tract of unimproved property in Los Angeles County, Calif. Shortly thereafter and following a condemnation of 8 of such acres by the county for the construction of a new high school, Lazarus entered into negotiations with a California corporation, Fox Markets, for the building of a market and shopping center on the tract. It was planned that a Fox Markets branch would form the

---

successor in interest with full transferee responsibility of N & V Realty Corporation and Branjon, Inc." Respondent in his answer to the amended petition admitted this allegation. On brief, petitioner argued that it is not liable as a transferee under sec. 6901 and that respondent has failed to meet the burden of proof imposed upon him by sec. 6902 to show that petitioner is liable as a transferee of property. After the stipulation was filed with the Court, counsel for petitioner in his opening statement orally moved to be granted leave to amend the petition to put transferee liability in issue. This motion was denied. Therefore, the issue of transferee liability is not before the Court on the basis of the pleadings in this case.

[2] All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year here in issue, unless otherwise stated.

nucleus of a shopping center which would contain numerous other smaller businesses. Lazarus was able to obtain the necessary financing, and construction of the shopping center began in 1958. It was completed the following year, and Fox Markets took occupancy as the principal lessee early in 1959. Thereafter, Lazarus became the sole owner of the Fox shopping center, having purchased his associates' interest.

On December 18, 1963, Lazarus incorporated Lazarus Realty Co. (Realty) under the laws of California. Simon Lazarus was the president of Realty and Mina Lazarus was the vice president. Realty immediately entered into a contract with N & V whereby Realty agreed to manage the Fox shopping center property. At the time of the agreement, the Fox shopping center included 1 supermarket and 11 stores occupied by lessees. The agreement called for N & V to pay Realty $24,000 a year, at the rate of $2,000 per month, as a management fee, plus 15 percent of all gross revenues earned by N & V in excess of $12,500 a month, or in excess of $150,000 a year, whichever method produced the higher amount. In addition to the typical functions relating to the operation and management of the Fox shopping center, Realty also agreed that it would guarantee the payment of all rent under the Fox shopping center leases and would enter into or change leases only with prior approval of N & V. The agreement was predicated upon the joint availability and performance of Lazarus, and N & V retained the right to terminate the agreement upon the death of either Simon or Mina Lazarus. In the absence of such termination, the agreement was to run from year to year so long as either Simon or Mina Lazarus was alive subject only to the right of either N & V or Realty to cancel the agreement upon 1 year's written notice to the other party. Such cancellation could be made only for cause.

During the period in issue, no bonus compensation as provided for by the management contract was earned or paid to Lazarus.

On June 18, 1963, Lazarus transferred all the stock of N & V to an irrevocable trust in exchange for an annuity agreement. The trustee was a Bahamian trust company, Aruba Bonaire Curacao Trust Co., Ltd. (ABC), and was given full power to sell the stock to third parties.

On January 2, 1964, ABC, as trustee of the Lazarus trust, sold all the N & V stock to World Entertainers, Ltd. (WE), a Bahamian corporation. Shortly thereafter, WE sold all of the N

& V stock to Associated Arts, N.V. (AA), a Netherlands Antilles corporation. In April or early May 1964, AA sold the N & V stock to Branjon, Inc. (Branjon), a California corporation formed by Leo Branton, Jr. The investment in the N & V stock was entered on the Branjon ledger as $3 million. Mr. Branton owned 100 percent of the stock of Branjon.

Following the acquisition of all of the stock of N & V by Branjon, the board of directors of N & V adopted a plan to dissolve and completely liquidate N & V and distribute all of the assets thereof to Branjon on May 19, 1964. The resolution was as follows:

WHEREAS, N and V Realty Corporation is a California corporation, with its principal office at 3460 Wilshire Boulevard, Suite 1010, Los Angeles 5, California; and

WHEREAS, N and V Realty Corporation was incorporated on April 15, 1963; and

WHEREAS, N and V Realty Corporation operates on a calendar year and filed a return for the taxable year 1963 in the Los Angeles Internal Revenue District; and

WHEREAS, Branjon, Inc., a California corporation, now owns 100% of the stock of N and V Realty Corporation; and

WHEREAS, Branjon, Inc. obtained said stock within the last 30 days for the sole purpose of obtaining the assets of N and V Realty Corporation:

IT IS HEREBY RESOLVED:

That the Board of Directors of N and V Realty Corporation hereby formally adopts a plan to dissolve completely and fully liquidate said corporation as rapidly as possible, but in no case later than the end of the current taxable year. N and V Realty Corporation shall cease doing business for all purposes as of this date and shall remain active only for essential steps in the course of liquidation. The assets of N and V Realty Corporation shall be distributed as rapidly as possible to Branjon, Inc., and all such assets shall be taken subject to the liabilities of N and V Realty Corporation. As soon as all of the assets and liabilities have been distributed to Branjon, Inc., formal dissolution with the State of California shall be completed and N and V Corporation shall cease to exist for all purposes. Leo Branton, Jr., Esq. and Kahan and DeMatoff, Certified Public Accountants, are hereby retained by N and V Realty Corporation to conclude the legal and accounting work necessary for the dissolution and liquidation of N and V Realty Corporation. Said counsel and accountants are specifically instructed to cancel the outstanding stock at the time the corporation is finally liquidated, and to make all necessary returns of distributions to the Internal Revenue Service on Forms 1096 and 1099L and all other necessary or required returns. The Secretary is instructed to certify a copy of this Resolution and attach it to Form 966.

By letter dated May 21, 1964, Leo Branton, Jr., as secretary-treasurer of N & V, mailed to the District Director, Internal

Revenue Service, Los Angeles, Calif., Form 966 advising the District Director that N & V had adopted a plan of complete liquidation.

On its Federal income tax return for its fiscal year ending January 31, 1965, Branjon deducted the depreciation attributable to the Fox shopping center for the period from May 19, 1964, to September 1, 1964. Branjon sold the Fox shopping center property at the end of August 1964.

From the execution of the management contract between N & V and Realty on December 18, 1963, through the various transactions of the stock of N & V, Simon and Mina Lazarus carried out the management functions with respect to the Fox shopping center property as employees of Realty. Realty provided services with respect to the Fox shopping center property from 1963 through at least 1967. In May of 1964, the management contract between N & V and Realty was revised. Realty was to receive the balance due on the original contract. Beginning in January 1965, compensation was to be reduced to $1,000 per month. Beginning in January of 1966, the bonus clause was revised to provide Realty with 5 percent of gross revenues in excess of $150,000 a year. The modified contract was to run for a period of 5 years.

On its Federal income tax return for the calendar year 1963, N & V deducted $6,000 for management fees paid to Realty. On its Federal income tax return for the calendar year 1964, N & V claimed a deduction of $24,000 for management fees paid to Realty.[3] N & V claimed depreciation deductions in 1964 only up to May 19, 1964, that being the date of its dissolution, based on a useful life of the Fox shopping center of 25 years. In addition, N & V reported only that income earned from the Fox shopping center during the first 5 months of 1964. N & V's payment of the $24,000 management fee, which represented the minimum fee due for the entire 1964 calendar year, was made within the first 5 months of 1964. Branjon did not pay a management fee to Realty for management services for any portion of the calendar year 1964.[4]

---

[3]Although N & V's return was for the entire calendar year 1964, its return should have been for the short taxable year Jan. 1 to May 19, 1964, the date of its dissolution. See secs. 441(b)(3) and 443(a)(2).

[4]On brief, petitioner argues that this stipulated fact was incorrect relying on certain records

In 1968, Leo Branton, Jr., sold all of the stock of Branjon to Bonaire. Thereafter, Bonaire merged Branjon into its operations in early 1969.

In his notice of deficiency, respondent disallowed $14,000 of the $24,000 deducted for management fees in 1964 on the basis that—

it has not been established that any amount in excess of $10,000 represented an ordinary necessary business expense in that year, or was expended for the purpose designated.

With respect to the recapture of depreciation, respondent stated that—

It is determined that during the taxable year 1964, you received ordinary income of $3,036.40 upon the distribution of your assets. Under section 1250 of the Internal Revenue Code, the gain realized on the realty transferred is limited to the excessive depreciation. Therefore, your taxable income is increased by the amount of $3,036.40.

Respondent takes the position that N & V is not entitled to a deduction for its short taxable year January 1 to May 19, 1964, for the $14,000 paid for management fees during that period for services to be rendered from June 1, 1964, through December 31, 1964.[5] In support of his position, respondent contends that (1) the $14,000 payment was not an allowable deduction as it was not an ordinary and necessary business expense of N & V under section 162; (2) these fees were not properly deductible since they created an asset which had a useful life which extended substantially beyond the close of the taxable year within the meaning of section 1.461–1(a)(1), Income Tax Regs.; and (3) even

---

of Branjon which were stipulated into the record. We have reviewed the records on which petitioner relies in requesting to withdraw from this stipulation and have concluded that they do not support petitioner's position that Branjon paid management fees to Realty with respect to the Fox shopping center in 1964.

[5] As pointed out in note 3 *supra*, N & V's return should have been filed for the short taxable year Jan. 1 to May 19, 1964, the date of its dissolution. There is no dispute between the parties as to the nature of the liquidation of N & V or the applicable sections of the Code. However, in discussion of the issues presented, it is important to identify the type of corporate liquidation involved in this case. Branjon purchased all of the stock of N & V in April or early May 1964, and a plan to dissolve and completely liquidate N & V was adopted on May 19, 1964. Therefore, it was a complete liquidation of a subsidiary, and Branjon and N & V were entitled to nonrecognition treatment on the distribution of N & V's assets under secs. 332 and 336, respectively. As the objective requirements of sec. 334(b)(2) were satisfied, Branjon received a step-up in basis of the property received equal to the purchase price of the stock. See *International State Bank v. Commissioner*, 70 T.C. 173, 180 (1978); *Cabax Mills v. Commissioner*, 59 T.C. 401, 408–409 (1972).

if the fees should be held to be deductible, the tax benefit rule requires that the deduction be restored to the income of N & V.

Petitioner takes the position that (1) since N & V was a cash basis taxpayer, the management fees were deductible when paid; (2) under the decision of the Ninth Circuit in *Zaninovich v. Commissioner*, 616 F.2d 429 (9th Cir. 1980), revg. 69 T.C. 605 (1978), the payment did not create an asset with a useful life which extended substantially beyond the taxable year; and (3) under the holding of the Ninth Circuit in *Commissioner v. South Lake Farms, Inc.*, 324 F.2d 837 (9th Cir. 1963), affg. 36 T.C. 1027 (1961), the tax benefit rule is inapplicable.

In support of his contention that the management fees are not deductible as an ordinary and necessary business expense under section 162, respondent contends that these fees represented an advance payment for services to be rendered in the future and for that reason are only deductible when the services are performed. The facts here show that the contract between N & V and Lazarus called for a management fee of $24,000 a year payable at the rate of $2,000 per month. The contract also provided that N & V retained the right to terminate the agreement upon the death of either Simon or Mina Lazarus. Accordingly, under the express terms of the contract, each $2,000 payment was not due until the beginning of each month and then only if Simon and Mina Lazarus were both living at the beginning of that month or, if not, N & V failed to exercise its right to terminate the contract upon the death of either of them.

Under these facts, we conclude that the management fees were not an ordinary and necessary expense of N & V except on a $2,000-a-month basis. There was nothing in the contract that required the payment of the $24,000 at the beginning of the year and in fact, because of N & V's contingent right to terminate the contract if either Simon or Mina Lazarus were not living, a payment of the $2,000 for any month in advance was purely a voluntary prepayment.[6] An advance payment by a cash basis

---

[6]We have not overlooked the fact that the contract between N & V and Realty was renegotiated in May 1964, apparently with a view to the liquidation of N & V. We do not have a copy of the renegotiated contract in evidence. We see nothing in the stipulated facts, that "Realty was to receive the balance due on the original contract" and beginning in January 1965 the fee was reduced to $1,000, to suggest that the monthly payment provisions or the right to terminate the contract upon the death of either Simon or Mina Lazarus were changed. More importantly, there was no evidence presented which might provide some insight into the

taxpayer of an item which he was not obligated to pay until a later time has been held not to be an ordinary and necessary business expense. *Williamson v. Commissioner*, 37 T.C. 941, 944-945 (1962). See also *Bassett v. Commissioner*, 26 T.C. 619 (1956). The situation here present is totally different from a situation where, by contract, a cash basis taxpayer is required to prepay an amount for a period extending beyond the close of its taxable year.

The decision of the Circuit Court in *Zaninovich v. Commissioner, supra*, upon which petitioner relies, is distinguishable on its facts from the instant case. The facts in *Zaninovich* show that the taxpayer was required on December 20 of the year there involved to pay the full 12 months' rent for a lease year December 1 to November 30. The Ninth Circuit in *Zaninovich* held that the provision of section 1.461–1(a)(1), Income Tax Regs., which states that an expenditure is not deductible if it results in the creation of an asset having a useful life extending "substantially beyond the close of the taxable year," has reference to an asset with a useful life of more than 12 months after the close of the taxable year in which the expenditure is made. In reaching that conclusion, the Circuit Court stated (p. 431):

> The cases involving substantially shorter terms in which taxpayers have been required to amortize have, unlike the case before us, involved advance payments, *see, e.g., Williamson v. Commissioner*, 37 T.C. 941 (1962) (payment on December 27, 1956 for a lease running for one year from March 1, 1957 where payment was not due until beginning of lease); *cf. D.K. McColl v. Commissioner*, par. 41,050 P-H Memo B.T.A. (Vol. 10, 1941) (deduction disallowed where rent paid on December 31 for following year because transaction was a sham but dicta indicated advance payment was deductible in year to which it applied), or accrual basis taxpayers, *see, e.g., Bloedel's Jewelry, Inc. v. Commissioner*, 2 B.T.A. 611 (1925) (payment in May, 1920 of rental due for a lease term running from September 1, 1920 to August 31, 1921). [Fn. ref. omitted.]

Since the instant case is distinguishable from *Zaninovich* in that here the advance payment was not required, we need not discuss whether following the decision of the Ninth Circuit (the circuit

---

business reasons for altering the contract so close in time to the complete liquidation of N & V. Because the burden of proof is on petitioner, we cannot infer that petitioner was bound by a valid obligation to prepay prior to its complete liquidation. See *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.

to which an appeal in this case would lie) would require us to conclude that the $24,000 payment by N & V did not create an asset with a useful life extending "substantially beyond the close of the taxable year."[7]

Having concluded that petitioner is not entitled to deduct the $14,000 as an ordinary and necessary business expense, it is not necessary to consider respondent's argument with respect to the tax benefit rule. However, since we agree with respondent that if N & V were entitled to deduct the entire $24,000 payment, it should be required under the tax benefit rule to include in its income for 1964 the portion of the expenditure relating to the 7 months after its liquidation, we will discuss this alternative argument of respondent.

The tax benefit rule requires that an item which is properly deducted and results in a tax saving be included in gross income in a subsequent year if it is recovered. See *Alice Phelan Sullivan Corp. v. United States*, 180 Ct. Cl. 659, 381 F.2d 399, 401–402 (1967); *Estate of William H. Block v. Commissioner*, 39 B.T.A. 338, 341 (1939), affd. sub nom. *Union Trust Co. v. Commissioner*, 111 F.2d 60 (7th Cir. 1940), cert. denied 311 U.S. 658 (1940). On its return for the taxable year 1964, which should have been a short taxable year, N & V deducted the $24,000 paid for management fees in arriving at its taxable income of $6,729.32. Therefore, if this deduction was proper, a tax benefit situation is presented if there was a "recovery" in the subsequent taxable year.[8]

We recently addressed this issue in *Tennessee Carolina Transportation, Inc. v. Commissioner*, 65 T.C. 440 (1975), affd. 582 F.2d 378 (6th Cir. 1978), cert. denied 440 U.S. 909 (1979).

---

[7]It should be pointed out, however, that the Circuit Court in its opinion in *Zaninovich v. Commissioner*, 616 F.2d 429, 432 (9th Cir. 1980), revg. 69 T.C. 605 (1978), stated that there were certain cases of this Court supporting a result contrary to the "one year rule" adopted therein. Further, it should be noted that the Circuit Court in *Zaninovich* justified its decision under the rationale that a payment made by a cash basis taxpayer for a period of 1 year or less, in the long run results in the same yearly deduction for that taxpayer, with the deduction in the first year of the amount due being offset by no deduction in the final year of the lease. Clearly, this rationale of a "balancing out in the end" is totally inapplicable to the instant case.

[8]We recognize that N & V could not have a "recovery" in a subsequent taxable year as its existence had terminated and that the use of the "tax benefit rule" label is therefore not technically correct. However, where the "recovery" occurs in the same taxable year, we agree with the Ninth Circuit that "tax benefit principles would seem to apply with even greater force in such a case as this." *Spitalny v. United States*, 430 F.2d 195, 198 (9th Cir. 1970). See also *Connery v. United States*, 460 F.2d 1130, 1133 (3d Cir. 1972).

That case involved the distribution, in complete liquidation of a subsidiary under sections 332 and 334(b)(2), of tires and tubes which had been expensed but not consumed by the subsidiary. In discussing the concept of "recovery" for the purposes of the tax benefit rule, we stated that "a taxpayer may have recovered an item previously expensed although *actually* he has neither received nor become entitled to receive money or property." 65 T.C. at 447. In applying that rationale, we found that the subsidiary had "recovered" the previous deduction because, as the expensed property was treated as having a fair market value in the distribution in liquidation (due to the operation of sec. 334(b)(2)), the subsidiary must "therefore necessarily be deemed to have received tires and tubes identical to them immediately prior to that transaction." 65 T.C. at 447. See *Anders v. United States*, 199 Ct. Cl. 1, 462 F.2d 1147, 1149 (1972), cert. denied 409 U.S. 1064 (1972); *Spitalny v. United States*, 430 F.2d 195, 198 (9th Cir. 1970). See also *Hillsboro National Bank v. Commissioner*, 73 T.C. 61, 67–68 (1979), affd. 641 F.2d 529 (7th Cir. 1981), in which we held that a bank had a "recovery" under the tax benefit rule where ad valorem property taxes paid by the bank were refunded directly to its shareholders after the tax was invalidated.

It is clear from the facts in this case that the decision herein is controlled by our holding in *Tennessee Carolina*. N & V was liquidated pursuant to sections 332 and 334(b)(2) and the parent corporation was therefore entitled to a step-up in basis of the assets received equal to the amount paid for N & V's stock.[9] N & V's liquidation prior to the full use of the expensed 12 months' worth of management fees created an asset, in the form of 7 months' services, which was distributed to the parent. The parent was then entitled to a basis in the future services equal to a proportion of the adjusted basis of the stock relative to the fair market value of the services.[10] In recognition of this increase in

---

[9]The parent's basis in the assets received is determined by allocating the adjusted basis of the stock among them in proportion to the net fair market value of such assets on the date received. See sec. 1.334–1(c)(4)(viii), Income Tax Regs.

[10]The fact that Branjon did not enter the future services as an asset on its books is of no relevance to our determination of the tax liability of N & V. However, we have assumed, and there was no evidence to the contrary, that, for the purposes of determining the basis of the services to which Branjon was entitled, the price it paid for the stock was equal to the fair market value of the assets of N & V.

basis of the expensed fees, N & V must have necessarily received an identical right to these services immediately prior to the distribution. Accordingly, the tax benefit rule is applicable. The result is that the tax benefit rule overrides the nonrecognition provision of section 336 and requires a restoration to the income of N & V to the extent of the recovery. As the portion of the cost of the services attributable to their remaining useful life is the only indication of fair market value at the time of distribution, we find that N & V must include $14,000 in its gross income for 1964, the taxable year of liquidation. See *Tennessee Carolina Transportation, Inc. v. Commissioner*, 65 T.C. at 448.

Petitioner contends that we should follow the Ninth Circuit's decision in *Commissioner v. South Lake Farms, Inc.*, 324 F.2d 837, 839–840 (9th Cir. 1963), affg. 36 T.C. 1027 (1961). In *South Lake Farms*, the parent corporation liquidated the subsidiary pursuant to sections 332 and 334(b)(2) after the subsidiary had deducted expenses incurred in the planting of a cotton crop and the preparation of lands for a barley crop, but before it had harvested and thus realized income from such crops. As a result, the subsidiary deducted its large expenditures from income and reported a net operating loss while its shareholders received the benefit of the expected crop income through the higher price paid for their stock which, absent dealer status under section 1221(1), represented a capital gain to them. On the other hand, the parent received the income produced by such expenditures tax free due to the step-up in basis under section 334(b)(2) and in fact reported a loss due to the expenses of harvesting.

The only issue decided by this Court in *South Lake Farms* related to the application of sections 446(b) and 482 to the facts there present. Before the Ninth Circuit, respondent argued that the fair market value of the unharvested cotton crop and the land preparation for the barley crop should be income to the subsidiary under section 446(b) because its method of accounting did not "clearly reflect income." As the subsidiary used an accrual basis of accounting, the Circuit Court concluded, as had this Court, that there was no alternative method of accounting under which the future income would have been properly attributed to the subsidiary. In the Circuit Court, respondent abandoned his argument under section 482, but in the alternative contended that the expenses incurred by the subsidiary in producing the cotton crop and preparing the barley lands should

be disallowed under section 446(b) and restored to the subsidiary's income because it received a "tax benefit" by deducting these expenses prior to liquidation, while its shareholders received a higher price for their stock due to these expenditures. The Ninth Circuit rejected respondent's theory, stating flatly that "We are of the opinion that section 446(b) cannot be so used." *Commissioner v. South Lake Farms, Inc., supra* at 839. While some of the language of the Circuit Court in discussing the tax benefit rule is broad, in our view, this language must be read in light of the issue being considered, which was the restoration to income of an item previously deducted, under the authority granted to respondent by section 446(b). For this reason, we conclude that *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. on other grounds 445 F.2d 985 (10th Cir. 1971), does not require us to hold that the judicially created tax benefit rule is inapplicable to this case.

In the instant case, respondent does not rely on section 446(b), but rather bases his claim on the judicially created tax benefit rule. See *Estate of William H. Block v. Commissioner, supra; Hillsboro National Bank v. Commissioner, supra* at 66. While we recognize the existence of the statutory rule contained in section 111, that a subsequent recovery of a deduction of certain specified items will not be included in income to the extent that it did not result in a tax reduction in the prior year, it is clear that the vitality of the general rule created by the courts, i.e., that if a deduction from gross income which has resulted in a tax benefit is recovered in a subsequent year it must be added to income in that year, remains uncontroverted. *Dobson v. Commissioner*, 320 U.S. 489 (1943).

In *Dobson v. Commissioner, supra,* a taxpayer had deducted losses on sales of his stock in 1930 and 1931 only to recover a portion of these losses in 1939 in a suit against the party from which he had purchased the stock. Respondent contended that the recovery was income in 1939 but we held that there was no realized taxable gain. *Dobson v. Commissioner*, 46 B.T.A. 770 (1942). Before the Supreme Court, respondent argued that the statutory tax benefit rule which excluded recoveries of bad debts, etc., was not applicable to the case because it did not specifically mention recoveries of "losses." In this regard, the Court stated (320 U.S. at 505–506):

The Government now argues that by extending legislative relief in bad debt

cases Congress recognized that in the absence of specific exemption recoveries are taxable as income. We do not find that significance in the amendment. A specific statutory exception was necessary in bad debt cases only because the courts reversed the Tax Court and established as matter of law a "theoretically proper" rule which distorted the taxpayer's income. Congress would hardly expect the courts to repeat the same error in another class of cases, as we would do were we to affirm in this case. [Fn. ref. omitted.]

See also *Tennessee Carolina Transportation, Inc. v. Commissioner*, 582 F.2d at 379; *Spitalny v. United States, supra* at 197; *Alice Phelan Sullivan Corp. v. United States*, 381 F.2d at 402; *West Seattle National Bank of Seattle v. Commissioner*, 288 F.2d 47, 48 (9th Cir. 1961), affg. 33 T.C. 341 (1959); *Putoma Corp. v. Commissioner*, 66 T.C. 652, 664 (1976), affd. 601 F.2d 734 (5th Cir. 1979); sec. 1.111–1(a), Income Tax Regs.

It is in reliance upon the judicially created tax benefit rule that we decide this case. While the Ninth Circuit in *South Lake Farms* did discuss the tax benefit rule and concluded that it was inapplicable, the fact remains that its discussion of the rule related solely to its holding that respondent's argument, that the rule somehow existed within the language of section 446(b), was without merit. In our view, the tax benefit rule is an independent doctrine that applies in this case. Therefore, we conclude that this case is distinguishable from the Ninth Circuit's decision in *South Lake Farms*. As a final comment on the merits of applying the tax benefit rule, we fully agree with the Sixth Circuit that the rule "should be applied flexibly in order to counteract the inflexibility of the annual accounting concept which is necessary for administration of the tax laws." *Tennessee Carolina Transportation, Inc. v. Commissioner*, 582 F.2d at 382.

The second issue presented is whether depreciation recapture under section 1250 applies to a corporation that has distributed its assets in complete liquidation. Section 1250(d)(3)[11] provides that the amount of excess depreciation required to be recaptured as ordinary income in the transfer of real property shall not

---

[11]Sec. 1250(d)(3) reads in part as follows:

(3) CERTAIN TAX-FREE TRANSACTIONS.—If the basis of property in the hands of a transferee is determined by reference to its basis in the hands of the transferor by reason of the application of section 332, 351, 361, 371(a), 374(a), 721, or 731, then the amount of gain taken into account by the transferor under subsection (a)(1) shall not exceed the amount of gain recognized to the transferor on the transfer of such property (determined without regard to this section). * * *

exceed the gain recognized to the transferor if "the basis of property in the hands of a transferee is determined by reference to its basis in the hands of the transferor by reason of the application of section 332." The parent company, Branjon, was accorded nonrecognition treatment under section 332 but it was also entitled to a step-up in basis equal to the amount paid for the stock of N & V under section 334(b)(2). As a result, the transferee did not determine the basis of the property received by reference to the basis of the property in the hands of the transferor, N & V, and the exception to depreciation recapture provided in section 1250(d)(3) is not applicable. See sec. 1.1250–3(c)(2)(i), Income Tax Regs. Therefore, as section 1250 provides that "such gain shall be recognized notwithstanding any other provision of this subtitle," it overrides the nonrecognition provision of section 336 and gain must be recognized on the distribution by N & V in liquidation to the extent provided in section 1250(a).

If recapture is required under section 1250, petitioner contends that respondent's calculation in the deficiency notice is incorrect. Respondent used 25 years as the useful life of the Fox shopping center, that being the useful life stated in petitioner's return for 1964. On brief, petitioner asserted that the correct useful life was 19 years, relying on *Hill v. Commissioner*, 63 T.C. 225, 250–251 (1974), in which we held that based on the "meager" record, the taxpayer was entitled to use the useful life selected of 19 years for the shopping center. As the property had been purchased from Branjon on August 19, 1964, by a group of individuals which had consolidated their cases in *Hill*, petitioner contends that we are precluded from a contrary result under the doctrine of collateral estoppel.

The issue of collateral estoppel must be affirmatively set forth in the pleadings. Rule 39, Tax Court Rules of Practice and Procedure; *Thomson v. Commissioner*, 42 T.C. 825, 831–832 (1964), affd. on other issues 343 F.2d 66 (1st Cir. 1965). In its amended petition filed on June 10, 1980, petitioner stated with reference to the depreciation deduction that—

Petitioner questions the correctness of the Notice of Deficiency as it refers to excessive depreciation. Further, no excessive depreciation is due from petitioner, and petitioner correctly reported depreciation for all purposes. Petitioner expects to raise issues of both law and fact with reference to the depreciation issue.

Clearly, petitioner did not assert collateral estoppel nor did it refer to *Hill* in its amended petition or at trial. More importantly, even if the issue had been clearly set forth, respondent did not concede, and petitioner did not introduce any evidence, that the property for which the useful life was determined in *Hill* was the same property for which the depreciation deduction was claimed by N & V. It is a fundamental principle of collateral estoppel that it "must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts * * * remain unchanged." *Commissioner v. Sunnen*, 333 U.S. 591, 599–600 (1948); see also *Montana v. United States*, 440 U.S. 147, 159 (1979). For the above reasons, we decline to apply collateral estoppel in the instant case. As petitioner has asserted no other errors in respondent's calculation of the depreciation recapture, we hold for respondent.

Finally, petitioner argues that respondent's determinations in the statutory notice of deficiency were arbitrary and capricious. In support of its position, petitioner relies on *Weimerskirch v. Commissioner*, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977), in which the Ninth Circuit held that respondent's deficiency notice, attributing taxable income to the taxpayer from the sale of narcotics, was erroneous because respondent offered no evidence linking the taxpayer to the sale of narcotics. Clearly, the principle of *Weimerskirch* is totally inapplicable to this case. See *Perrett v. Commissioner*, 74 T.C. 111, 135–136 (1980). Here, respondent did not rely on any presumption of correctness of his deficiency notice. In fact, the figures used by respondent in the deficiency notice were taken directly from the tax returns and records of N & V.

*Decision will be entered for the respondent.*