T.C. Memo. 2010-256

UNITED STATES TAX COURT

CONSTANTINE SAKKIS, et al.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 20653-03, 20819-03,    Filed November 18, 2010.
            20820-03, 23428-05.

<u>Shawn R. Perez</u>, for petitioners.

<u>Christian A. Speck</u>, for respondent.

MEMORANDUM OPINION

HOLMES, <u>Judge</u>:  Constantine Sakkis is a shrewd and successful

businessman.  With his wife, Carol, he filed a Form 1040 for 2000.

As they had done for many years, the Sakkises filled out and

_____

[1] We consolidated the cases filed by Carol Ann Sakkis,
docket nos. 20819-03 and 23428-05, with those filed by her
husband Constantine Sakkis, docket nos. 20820-03 and 20653-03.

attached numerous schedules on which they reported their income and deductions.  Only this time, there was one major difference: on line 21 of the Form 1040--the line designated for "Other income"--they listed a completely frivolous section 861[2] deduction of $642,370.  The Commissioner recoiled, and treated the entire return as both frivolous and fraudulent.  The Sakkises have since repented of the deduction, but argue that they committed no fraud by taking it.  They also admit that they should have filed a 2001 tax return, which they did only after the Commissioner caught them and sent a notice of deficiency.  There are numerous contested deductions for both years; looming over the Sakkises is the question of just what penalties the bad deduction will subject them to for the 2000 tax year.

## Background

Constantine Sakkis began working as a real-estate salesman in the mid-1970s.  Within a couple of years, he took some state-required courses--including a course on real-estate law--and became a fully licensed real-estate broker.  By 2000, Sakkis's business focus had swiveled from selling to managing rental

---

[2] Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years at issue; all Rule references are to the Tax Court Rules of Practice and Procedure. The gist of the section 861 argument is that only foreign-source income is taxable and therefore a taxpayer's domestically earned money isn't.  Internal Revenue Service, The Truth About Frivolous Tax Arguments, sec. I.B.2., at 18-19 (Jan. 1, 2010), http://www.irs.gov/pub/irs-utl/friv_tax.pdf.

property and other types of investments, but he kept his real-estate broker's license to do business for past clients and referrals.  Carol Sakkis worked for the local phone company until shortly after she and Sakkis married and then stayed at home to raise their three children, who were born in 1978, 1979, and 1982.

The Sakkises' tax trouble began with a great windfall.  In the 1980s, the FCC gave away 422 rural cell-phone licenses via a lottery.  Many people formed partnerships at the time to enter the FCC lottery as often as possible to try to win as many licenses as possible.  An organizer typically solicited investors who would each put up about $12,500 and would be more or less randomly put into a partnership consisting of about 20 investors.  Sakkis learned of this and entered several times, using both his own name and his wife's.  They won big.  Metacomm Cellular, one of the partnerships in which Sakkis invested using his wife's name, received two licenses; it sold one immediately, but kept the other--a license entitling it to build a cell-phone system in northwest Wyoming.  This eventually became a franchise of CellularOne, and Metacomm eventually converted from a partnership to an LLC.  In spite of the fact that the investment was in his wife's name and although she was aware of it, it was Sakkis himself who actively participated in Metacomm.  This was consistent with their usual division of labor--though she balanced

the couple's checkbook each month, she otherwise let her husband manage all their business decisions.

In 1999, Western Wireless offered to buy the assets of the Wyoming cell-phone operation. Metacomm negotiated a sale for $20.2 million--a return of approximately 80 times the investors' initial investments. The deal closed in May 2000, and Metacomm disbursed the Sakkises' share of the profits by sending a total of four checks in Carol's name--two in May 2000, one in October 2000, and the final check in December 2001. Carol received more than $700,000 in 2000 and then another $130,000 in 2001.

Toward the end of 2000, Sakkis began to look for ways to avoid paying taxes on the gain. He first tried to use a multi-trust tax shelter, which he learned of during a "capital preservation" seminar on the remote Pacific island of Vanuatu. The shelter involved setting up domestic and foreign trusts and moving the money around between these trusts until it could allegedly be repatriated tax free. Sakkis tried to create such a trust (which he named the Carolina Trust) and retroactively transfer his wife's Metacomm interest into it as the first step in this plan, but Metacomm had already made three distributions into the Sakkises' personal bank account. Sakkis eventually realized that he had not properly funded the trust and that it was therefore ineffective as a tax shelter. On November 26, 2001, he sent Metacomm a letter telling it that the Carolina Trust had been

abandoned effective January 1, 2001, and that his wife's interest in Metacomm should be transferred back to her.

Joseph Pakin, the Sakkises' accountant and tax preparer for the previous 15 or so years, prepared their 2000 tax return in October 2001 after filing the necessary requests for extension. He also reported the Metacomm distributions on the return as long-term capital gains, which is exactly what they were. According to Pakin's return, the Sakkises owed over $128,000 in taxes, including $2,223 in self-employment taxes, plus an estimated-tax penalty. (The return also calculated an alternative minimum tax of $6,425.)

Unwilling to pay that much, Sakkis took Pakin's return and handed it over to Douglas Rosile.[3] Rosile was an accountant who specialized in providing taxpayers with a multipage argument to attach to their tax returns which claimed that the taxpayer didn't owe any taxes due to section 861. Rosile took Pakin's return and added a $642,370 deduction on line 21 of the first page with a notation reading "26 CFR 1.861-8(f)(1) EXCL -642,370." This

_____

[3] A district court in Florida issued a preliminary injunction banning Rosile from preparing or helping to prepare tax returns for others less than one year after Sakkis used his services. United States v. Rosile, 90 AFTR 2d 2002-5094, 2002-2 USTC par. 50,566 (M.D. Fla. 2002) (order granting preliminary injunction). Rosile was later sentenced to 54 months followed by three years supervised release for his part in actor Wesley Snipes's use of the section 861 argument. See United States v. Snipes, No. 5:06-CR-00022 (M.D. Fla. Apr. 24, 2008) (sentencing minutes for Douglas P. Rosile).

deduction reduced the taxable income on the second page of the return to zero. The self-employment tax--which wouldn't have been reduced by the 861 deduction--mysteriously disappeared, as did Pakin's calculation of alternative minimum tax. Otherwise this return showed everything Pakin's return had. Both Sakkises signed and filed this new 861 return.

They didn't file amended returns for any previous year and didn't use the argument for any later year either. They didn't tell their children--who had begun to file their own returns by this time--about this supposedly miraculous section of the tax code that would absolve them of their tax obligations. Sakkis did mention the section 861 argument to Pakin, but when Pakin expressed skepticism, he went against the advice of his longtime accountant and instead followed the advice of someone he had spoken to only over the phone.

The Sakkises also didn't use the section 861 argument the following year--instead, they just didn't bother to file a return at all. Sakkis had met his third tax-avoidance specialist, Eduardo Rivera.[4] Rivera was a licensed attorney who encouraged his clients not to file tax returns but instead to wait for the government to send a notice indicating the income it had in its

---

[4] A district court in California would later permanently enjoin Rivera from "interfering with the enforcement of the internal revenue laws." United States v. Rivera, 92 AFTR 2d 2003-6844, 2003-2 USTC par. 50,621 (C.D. Cal. 2003) (order granting default judgment and permanent injunction).

system and only then present all possible deductions, paying taxes only on that possibly much smaller amount. Sakkis followed Rivera's advice, and the Sakkises didn't file a 2001 tax return.

The IRS treated the Sakkises' 861 return as frivolous and rejected it completely, which meant that as far as the IRS was concerned, the Sakkises didn't file a valid return for either 2000 or 2001. The Commissioner initially sent notices of deficiency to Sakkis for 2000 and to both Sakkis and his wife separately for 2001.[5] The Sakkises filed timely petitions while residing in California, and we tried the cases in San Francisco.

Before trial, the Sakkises retained a new accountant and a new attorney to represent them. As a result, the Sakkises have now conceded their section 861 argument and agree that the profits from the Metacomm sale are taxable. The Commissioner, however, alleges that their use of the argument in the first place was fraudulent and asks that we impose on any 2000 deficiency either a fraudulent failure-to-file penalty or, if we find that the 2000 return was valid for filing purposes, a fraud penalty. There are also many other contested items. We sort out the contested

---

[5] Because the Metacomm income was improperly reported as income of the Carolina Trust in 2000, it wasn't until 2005 (when the Commissioner discovered the mixup) that he realized Carol Sakkis had income for that year and issued a separate notice of deficiency to her for 2000. She contested the deficiency in this Court, and we consolidated that case with the others that the Sakkises had filed.

deductions and exemptions for both years, and then discuss the penalties that the Commissioner determined for 2000.[6]

## Discussion

## I. Substantiation

Because the Commissioner determined the 2000 return to be invalid and because the Sakkises didn't file a tax return for 2001, the Commissioner at first denied almost all the Sakkises' deductions and exemptions for both years.  The Commissioner has since conceded most of these items, either by stipulation or in his posttrial briefs.[7]  Several remain unresolved, and we address them by year and type.

### A. 2000 Tax Year

#### 1. Schedule C--Business Deductions

##### a. Dome Realty & Investment

Dome Realty & Investment was the sole proprietorship under which Sakkis managed his various investments and acted as a broker

---

[6] The parties agree that the late-filed 2001 return is subject to a failure-to-timely-file penalty.  The Commissioner also asserted a section 6654 penalty for failure to pay estimated tax.  The parties didn't stipulate this issue away, but the evidence supports the Commissioner and the Sakkises haven't contested it.

[7] The Commissioner also determined in the notice of deficiency for 2000 that Sakkis had received $1,073 of nonemployee compensation from Nevada Titan Energy, Inc.  The parties stipulated various amounts of nonemployee compensation, but did not specifically dispose of this item.  Sakkis had the burden of contesting it, so we treat his failure to do so as a concession.  See Rule 151(e)(4) and (5); Money v. Commissioner, 89 T.C. 46, 48 (1987).

on the rare occasions when a former client or a referral asked him to.  The Commissioner conceded many of the business deductions Sakkis claimed, but continues to contest the following:

| | |
|---|---|
| Wealth Creations | $50.00 |
| AGO Options | 260.00 |
| Jaja Group | 80.40 |
| Independent Investor | 65.00 |
| British American | 219.92 |
| Investors International | 3,992.56 |
| Duane Gomer Seminars | 119.50 |

Sakkis argues that each of these expenses is substantiated by the credit-card statements he provided.  We agree that the credit-card statements can substantiate expenses even if some of the other charges on the credit card were personal.  See, e.g., Nelson v. Commissioner, T.C. Memo. 2001-117.  We also believe Sakkis's testimony that the first six payments above were for investment expenses and that the payment to Duane Gomer Seminars was in preparation for renewing his real-estate broker's license.  We therefore find in Sakkis's favor for all these deductions, but only the payment to Duane Gomer Seminars is a business expense reportable on Schedule C.  The other payments are all Schedule A miscellaneous deductions under section 212.  See also sec. 67(b).

### b. Mobile-Radio Business

One of Sakkis's side businesses that didn't at first require his personal management was the direct ownership of a specialized mobile radio license in Los Angeles.  In 2000, the company that managed his license for him went out of business, and Sakkis had

to become personally involved.  According to his testimony, that meant driving down to Los Angeles two or three times to be physically present, which resulted in $842 of car and truck expenses and $863 in travel expenses.

Although we have the power to estimate most business expenses, see Cohan v. Commissioner, 39 F.2d 540, 543-44 (2d Cir. 1930), those expenses listed in section 274 require more detailed and precise substantiation.  Both car-and-truck, and travel, expenses are covered by section 274(d).  This means that to claim such expenses, a taxpayer must substantiate his deductions with "adequate records," such as a logbook or diary.  Sec. 1.274-5T(c)(2)(i), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985).  And such records must include, among other information, the amount of the expense and its business purpose.  Sec. 274(d). Sakkis's records do not.  We therefore disallow them.

### 2. Schedule E--Rental Properties

#### a. Monument Property

In 1984, the Sakkises bought a 50-percent interest in a shopping center on Monument Boulevard in Concord, California.  To finance the purchase, the Sakkises and the owners of the other 50-percent interest, the Tsakoyias, together signed an all-inclusive note for $880,000 payable to the previous owners of the shopping center.  At least some of the landlord-tenant agreements for the shopping center provided that taxes, insurance, and

maintenance and repairs--or "triple-net" expenses--would be paid by the tenants, but all other expenses were to be borne by the landlords.  The Sakkises sold their 50-percent ownership in this property in April 2000.  For the four months that they owned it during that year, they claimed $1,386 in "triple-net" expenses and $11,149.50 for interest paid on the all-inclusive note.

Both of these deductions are typical of the type of expenses usually incurred with rental property, and are subject to the Cohan rule allowing us to estimate.  We must, however, have some basis upon which to make the estimate.  Vanicek v. Commissioner, 85 T.C. 731, 742-43 (1985).  There is nothing in this record to help us estimate these "triple-net" expenses, so we disallow them. For the interest expense, however, we have a copy of the all-inclusive note which indicates equal ownership of the property by the Sakkises and Tsakoyiases as well as repayment terms for the loan.  We find Sakkis credible that the interest rate was kept at 10 percent after the first 10-year period.  We therefore allow the entire $11,149.50 as a rental expense on Schedule E.

### b. Capri Motel

The Capri Motel is a 32-room building originally built as a motel near Highway 99 in Fresno, California and which Sakkis bought in the early 1980s as an investment.  Around 1983, Turning Point of Central California--a nonprofit social-service agency-- took over the Capri Motel lease, keeping the same terms as the

previous tenant. One of those terms was that the tenant would pay more than the rent each month to cover fire insurance, repairs, and maintenance. The landlord would then write a check for a predetermined amount back to the tenant each month, and the tenant would place that money into a separate account. The tenant would then pay the fire insurance and the cost of repairs and maintenance from that account (i.e., it was something like an escrow account). According to the CEO of Turning Point, the reason for using rent refunds like this rather than just paying for the repairs directly was so that there would be a ready pool of cash from which Turning Point could make any unexpectedly costly repairs without having to contact Sakkis or come up with the additional money on short notice.

Each year Turning Point would issue a 1099 to Sakkis for the full amount of rent paid, including the excess which would be sent back. Sakkis would in turn report the amount shown on the 1099 and then deduct the rent refunds as business expenses. In 2000, Sakkis claimed rent refunds of $9,577.30. The Commissioner doesn't dispute this amount--the Sakkises provided canceled checks made out to Turning Point to substantiate it--but instead claims that the arrangement wasn't a binding, contractual obligation and therefore wasn't a necessary expense.

Deductions are allowed under section 162(a) for "ordinary and necessary expenses" incurred while "carrying on any trade or

business." There is no dispute that fire insurance, maintenance, and repairs are ordinary expenses for rental property or that they were incurred in "carrying on any trade or business." The only question is whether it was necessary for Sakkis to refund a portion of the rent paid by Turning Point to cover those expenses.

Under Welch v. Helvering, 290 U.S. 111, 113 (1933), the Supreme Court equated the term "necessary" in section 162 with "appropriate and helpful." See also Waring Prods. Corp. v. Commissioner, 27 T.C. 921, 929 (1957) (noting legal obligation not required for expenditure to be deductible and explaining that "the basic question is whether, in all the circumstances, the expenditure is ordinary and appropriate to the conduct of the taxpayer's business"). Nevertheless, the Ninth Circuit has said that voluntary prepayment of expenses is generally not necessary without a legal obligation, albeit with two exceptions. Bonaire Dev. Co. v. Commissioner, 679 F.2d 159, 161-62 (9th Cir. 1982), affg. 76 T.C. 789 (1981). One exception is when "the taxpayer has an appropriate or compelling business reason for making a payment in advance other than that it is due, such as to take advantage of depressed prices or to secure future deliveries or preferential treatment." Id. at 162.

We find that there was an appropriate business reason for the rent-refund arrangement between Sakkis and Turning Point. The obligation to make repairs was on Turning Point, and Sakkis was in

truth a mere conduit for the funds, which were immediately returned to Turning Point so that it could fulfill its obligation to repair. According to credible testimony, the arrangement is not unique to this particular landlord and tenant. For these reasons, we find that the rent-refund payments are allowable as a Schedule E expense.

### 3. Schedule A--Home Mortgage Interest

Section 163 allows a tax deduction for interest paid on the mortgage of a taxpayer's primary or secondary residence. Sec. 163(a), (h)(2)(D). This deduction is only for "acquisition indebtedness"--i.e., a loan used to acquire, construct, or substantially improve a residence when that residence also secures the loan--up to $1 million and "home equity indebtedness"--any other type of loan secured by a qualified residence--up to $100,000. Sec. 163(h)(3)(A), (B), and (C).

The Sakkises originally paid cash for the land on which their primary residence sits. Sakkis credibly testified that they then borrowed money to build the home, and converted the construction loan into a permanent loan when the house was finished. Although there was some confusion at trial as to when exactly the construction loan converted into a permanent loan--Sakkis testified that they moved into their home in 1990 but that construction ended in 1993--we nonetheless find his testimony to be credible on the purpose and continuity of the loans. This

original permanent loan was later refinanced, but that doesn't affect eligibility for an interest deduction as long as the new loan doesn't exceed the refinanced amount. See sec. 163(h)(3)(B)(i).

The Sakkises' original permanent loan was for $448,000, which is well below the statutory limit of $1,000,000. The Form 1098, Mortgage Interest Statement, for 2000 shows a starting loan balance of $436,367.38 and an ending loan balance of $431,381.01-- both of which are below the "acquisition indebtedness" of $448,000. We therefore find that the entire $30,390.29 of mortgage interest as shown on the Form 1098 is deductible as qualified residence interest.

### B. 2001 Tax Year

The Sakkises filed a 2001 return only as trial neared. The Commissioner accepted almost all of the items. We address those that remain.

#### 1. Schedule E--Capri Motel

In 2001, the Sakkises claimed $9,710.58 in rent refunds to Turning Point. For the reasons we've already discussed above, we find that this deduction is allowable.

#### 2. Schedule A--Home Mortgage Interest

As explained above, the Sakkises are entitled to a deduction of their home-mortgage interest as shown on their Form 1098. For 2001, this amounts to $27,543.94.

### 3. Schedule D--Capital Gains

The Sakkises claimed in their posttrial reply brief that they had $6,228 in capital gains for 2001. However, this appears to be a mere computational error rather than a modification of the previously stipulated values. We therefore hold that the Sakkises had $6,289 in capital gains for 2001, which is the total agreed to in the stipulation of facts.

### 4. Exemptions for Dependents

In 2001 an adult child of a taxpayer could be listed as a dependent on the taxpayer's return if during the tax year the taxpayer provided more than one-half of his support, sec. 152(a), he was a student who had not yet turned 24 by the end of the tax year, sec. 151(c)(1), he couldn't claim an exemption on his own tax return, sec. 151(d)(2), and he was a U.S. citizen or resident, or a resident of a country contiguous with the United States, sec. 152(b)(3). The Sakkises' three children turned 19, 22, and 23, during 2001. The only direct proof we have that the rest of the requirements were met comes from the testimony of the Sakkises themselves. We do, however, also have Pakin's testimony that he prepared tax returns for each child for the prior two years (1999 and 2000), and that the children didn't claim themselves as dependents in those years. We also have Sakkis's credit-card receipts from 2000 showing that he paid basic living expenses for the oldest child. We therefore find credible the Sakkises'

testimony that they continued to support all three children through 2001, that none of the children claimed personal exemptions for themselves, and that the children were enrolled in college. Based on the indirect evidence from prior years and the Sakkises' credible testimony, we find that the Sakkises are entitled to claim dependency exemptions for all three children on their 2001 tax return.

II. <u>Penalties for 2000</u>

Even the Sakkises now concede that the section 861 deduction on their 2000 tax return was improper. And we specifically find that the Sakkises did not have a good-faith belief in the validity of the section 861 argument. The question is whether taking that deduction amounted to fraud. For an action to rise to the level of fraud, there must be an intentional wrongdoing with the intent to evade tax believed to be owing. <u>Bradford v. Commissioner</u>, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601. The Commissioner can prove fraudulent intent with certain types of circumstantial evidence, known as "badges of fraud." <u>Id.</u> Before we can decide whether the Sakkises committed fraud, however, we will first decide if their 2000 return was a valid return under the Code.

A. <u>The 2000 Return as a Valid Return</u>

In <u>Beard v. Commissioner</u>, 82 T.C. 766, 777 (1984), affd. 793 F.2d 139 (6th Cir. 1986), we distilled the Supreme Court precedent defining a valid tax return into a four-part test:

> First, there must be sufficient data to calculate tax liability; second, the document must purport to be a return; third, there must be an honest and reasonable attempt to satisfy the requirements of the tax law; and fourth, the taxpayer must execute the return under penalties of perjury.

The parties here do not contest that the Sakkises' return has sufficient data to calculate the tax liability, that the return purports to be a return, or that the Sakkises executed the return under penalties of perjury. The Commissioner asserts only that the 861 return was not an honest and reasonable attempt under the third part of the <u>Beard</u> test.

Although there have been many cases applying <u>Beard</u>, few of these are what one can accurately, if clumsily, call stand-alone third-prong cases. In <u>Beard</u> itself, we stated that when tax-protester arguments--like the section 861 deduction--are used, "it is obvious that there is no 'honest and genuine' attempt to meet the requirements of the code." <u>Id.</u> at 779. That was, however, in the context of a taxpayer who impaled himself on the first prong by intentionally tampering with the tax form in a way that prevented the Commissioner from being able to determine the tax due. We've similarly held that a taxpayer didn't make an honest and reasonable attempt to file when the taxpayer wrote down all

zeros or asterisks or similarly uninformative entries.  See, e.g.,
Cabirac v. Commissioner, 120 T.C. 163, 168-69 (2003) (zeros);
Coulton v. Commissioner, T.C. Memo. 2005-199 (same);[8] Turk v.
Commissioner, T.C. Memo. 1991-198 (asterisks); Hintenberger v.
Commissioner, T.C. Memo. 1990-36 (lines blank), affd. without
published opinion 922 F.2d 848 (11th Cir. 1990); Thomas v.
Commissioner, T.C. Memo. 1985-241 (the word "object").  But just
as in Beard, in all of these cases failure to satisfy the third
prong was coupled with a skewering on the first prong.

In most every tax-protester case that we have found, the
taxpayer had either refused to enter the correct income for the
year or had altered the form in some way that the form itself or
the attestation at the bottom was void.  The Sakkises' cases are
more similar to the situation we analyzed in Steines v.
Commissioner, T.C. Memo. 1991-588, affd. without published opinion
12 F.3d 1101 (7th Cir. 1993).  The taxpayer in Steines attached
Schedules C for fictitious businesses and claimed outrageous
deductions for a cumulative business loss of exactly $100 billion.
But, aside from three small items of income,[9] the taxpayer

---

[8] Coulton v. Commissioner, T.C. Memo. 2005-199, also
distinguishes a line of Ninth Circuit cases starting with United
States v. Long, 618 F.2d 74 (9th Cir. 1980), which held that a
return with all zeros was still a return for purposes of the
willful failure-to-file misdemeanor in section 7203.

[9] These items of income totaled $231 and appear to have
consisted entirely of earned interest.

correctly reported all of his wages and earnings as well as his name, address, Social Security number, and proper filing status, proper number of exemptions, and the correct amount of income taxes withheld. With all this information, one could determine the taxpayer's proper tax liability despite the frivolous deductions, and we found that the return was a valid tax return rather than a legal nullity, although of course a tax return subject to negligence penalties.[10]

We made the distinction in Steines between that case and "those protester returns that contain frivolous * * * legal claims and *that contain no information or figures from which a determination of tax liability can be made*." Id. (emphasis added). Although the Sakkises used a frivolous legal claim to reduce their tax liability to zero, the rest of their return--like the return in Steines--contained complete and accurate information from which the Commissioner could determine their tax liability.[11] With the exception of the frivolous deduction itself and the

---

[10] This holding is in line with other cases dealing with frivolous deductions and credits, where a negligence penalty was inflicted but the validity of the tax return itself was never even addressed in the opinion. See, e.g., Dwight v. Commissioner, T.C. Memo. 1988-100 (war-tax credit).

[11] The Sakkises even filed a Schedule SE, Self-Employment Tax, that shows the amount of the self-employment tax and deduction that appear on the return prepared by Pakin, as well as a Form 6251, Alternative Minimum Tax--Individuals, showing the AMT calculated by Pakin. Although those numbers wandered off the 1040, the Sakkises did still send them to the IRS on these supporting schedules.

disappearance of the self-employment tax and alternative minimum tax, the Sakkises made an honest and reasonable attempt to comply with the tax laws. And while the use of that deduction may indicate negligence, it does not nullify their entire tax return. We therefore find that the Sakkises filed a valid 2000 return.

B. Section 861 Return as Fraud or Fraudulent Failure to File

There are two different sections under which one can be penalized for fraud: section 6651(f) for a fraudulent failure to file, and section 6663(a) for an underpayment attributable to fraud. Because we have determined that the Sakkises filed a valid return for the 2000 tax year, any fraud penalty must come under section 6663(a). The Commissioner has the burden of proving fraud with clear and convincing evidence. Sec. 7454(a); Rule 142(b). To meet this burden, the Commissioner must show that "the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes." Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).

The Commissioner's initial offer of proof was the fact that the Sakkises understated their 2000 tax liability. The typical "badge of fraud" is an understatement of income, see Bradford v. Commissioner, 796 F.2d at 307, but we may also infer fraud from claiming excess deductions, see Hicks Co. v. Commissioner, 56 T.C. 982, 1026-27 (1971), affd. 470 F.2d 87 (1st Cir. 1972). In this case, however, we find the mere fact that the Sakkises understated

their tax liability with an obviously bogus 861 deduction is not--when seen in conjunction with the otherwise accurate (or at least contestible if inaccurate) numbers on their return--enough to show clear and convincing evidence of a fraudulent intent.

The Commissioner next argues that the Sakkises went along with Rivera's strategy of not reporting income to the IRS. But we point out yet again that, for 2000, the Sakkises *did* report all of their income. While it is true that they didn't file for 2001, that is the only year for which they failed to file a return.

The Commissioner also argues that the Carolina Trust was a sham trust designed to conceal income. Although that might have been the Sakkises' initial intent in creating the Carolina Trust, they never actually used that trust, and in fact reported all the income from the Metacomm sale on their 2000 return. The fact that Metacomm improperly reported this income on a K-1 to the Carolina Trust doesn't by itself rise to the level of fraud.

Finally, the Commissioner points out that the Sakkises were very uncooperative and lacked candor during the Appeals process and throughout pretrial preparation. We agree. However, we find that their lack of candor and cooperation just aren't enough, especially for Carol Sakkis. We find her testimony that her husband handled all the taxes and investments to be credible and to explain her apparent evasiveness.

The clear and convincing standard of proof is rather high, and the Commissioner just didn't satisfy his burden.  We find that the Sakkises are not liable for a fraud penalty.

C. Alternative to Fraud: 6662 Penalty

On the other hand, the Sakkises are liable for the 20-percent penalty for "negligence or disregard of rules or regulations" under section 6662(a) and (b)(1) for underpaying their 2000 taxes. They completely disregarded the advice of their longtime tax preparer and instead followed the advice of someone they had never met and to whom they had only recently been introduced.  Pakin told the Sakkises that he was skeptical of the section 861 argument, but the Sakkises didn't investigate it beyond talking to the shysters they'd become entangled with.  Pakin's warning eliminates any good-faith reliance defense.

D. Other 2000 Penalties

The Commissioner also asserts that the Sakkises owe a section 6654 penalty for failure to pay estimated tax and has shown evidence of their underwithholding.  And in the later-issued 2000 notice of deficiency, the Commissioner asserted in the alternative a failure-to-pay penalty under section 6651(a)(2) against Carol (though he had specifically denied asserting the same penalty against Constantine).  The record supports the Commissioner on these items and the Sakkises don't present any evidence in their defense, so the penalties stick.

This opinion and the parties' concessions require that

<u>Decisions will be entered under Rule 155</u>.