WILLIAM B. SCHEIDT and WANDA C. SCHEIDT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Scheidt v. Commissioner
Docket No. 2568-79.
United States Tax Court
T.C. Memo 1982-503; 1982 Tax Ct. Memo LEXIS 242; 44 T.C.M. (CCH) 1011; T.C.M. (RIA) 82503; September 1, 1982. *242 Petitioner advanced $37,869.49 to H & R on December 26, 1975, to cover his share of the estimated costs of drilling two oil wells. H & R was not obligated to drill or service the wells. Instead, H & R, as operator, would use the money advanced by petitioner and other investors to pay independent drillers and service companies if H & R decided to drill the wells. Held, petitioner's advance to H & R constituted an investment in a drilling venture and was not itself deductible as intangible drilling and development costs ("IDC"). Sec. 263(c), I.R.C. 1954; sec. 1.612-4, Income Tax Regs.
The wells never were drilled, H & R did not prepay drillers or service companies in 1975. Held, petitioners are not entitled to a 1975 IDC deduction because there was no IDC payment in 1975. Ray K. Babb, Jr., for the petitioners. John L. Simpson, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined a deficiency in petitioners' 1975 income tax of $14,976.39. The issue for decision is whether petitioners are entitled to deduct $37,869.49 in 1975 for prepaid intangible drilling and development costs ("IDC"). This case concerns William B. Scheidt's oil and gas investments. Wanda C. Scheidt is a party to this proceeding solely because she filed a joint income tax return with her husband, William B. Scheidt. Consequently, William B. Scheidt will be referred to in this opinion as the petitioner. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation and the *244 attached exhibits are incorporated herein by reference. Petitioners resided in Oklahoma City, Oklahoma, when they filed the petition in this case. Petitioners maintained their books and records and filed their income tax returns on a calendar year basis using the cash receipts and disbursements method of accounting. On December 29, 1973, petitioner entered into an agreement (the "1973 agreement") with H & R Oils, Inc. ("H & R") concerning the development of three oil and gas leases. Additional individual investors joined petitioner and H & R in this venture. H & R was in the business of exploring for and operating oil and gas properties. Alex J. Hickey had been president of H & R since its formation in the early 1960's. H & R operated primarily in west-central Texas. The leases involved in this case were located in Runnels County, which is located in west-central Texas. The 1973 agreement provided as follows: I H & R is the present owner of a 100% working interest and an 80% revenue interest in the leases described below and this agreement is, in all things subject to the terms and provisions of the basic leasehold estates on the subject premises. [Detailed *245 description of leases omitted. The leases were the Barr lease, the Gottschalk lease and the Moonen lease.] II Subject to the availability of drilling rig and pipe, H & R agrees to commence immediately the drilling of a test well on the Jonnie H. Barr Lease. This well will be drilled to a depth sufficient to test the Caddo Formation at approximately 4300 ft. The well will be drilled with the deligence [sic] and all shows of oil or gas will be tested in accordance with good oil field practice. III H & R agrees to sell and you agree to buy three-eighths of the working interests in the above described leases and three-eighths of the working interest in the Barr well, drilled, tested and logged, to the casing point, for the turn-key price of Fifteen Thousand Dollars ($15,000.00). IV H & R will drill or caused to be drilled the Barr well in a good and workman like manner to the depth specified herein, at its sole cost and responsibility and except as otherwise herein specifically set out, at no cost, risk and responsibility either directly or indirectly incurred to you. H & R agrees to run approximately 1500 ft. of surface pipe cemented from top to bottom; Drill stem *246 test all zones that show oil or gas in samples, and when well has reached total depth to run Induction Logs, Micro-logs and Sonic Logs. V You or your representatives are to have access to the derrick floor of the well at all times, and to all information in connection with the drilling and testing of said well. H & R will save samples of all cuttings and before any tests or logs are run, will notify you as requested. VI Upon completion of drilling and running logs, if production casing is run and completion attempted, all casing, tubing, equipment, and completion costs will be shared on a pro-rata basis; Any development wells drilled on the described leases will also be shared on a pro-rata basis. It is further agreed and understood that you have the option, but not the obligation, to participate in further development wells. VII If the Barr Well results in a commercially productive well of oil and or gas, H & R and you will enter into a Standard Form Joint Operating Contract Agreement, designating H & R as operator. A copy of the Operating Agreement and Accounting Procedure, marked exhibit "B" is attached and made part of the agreement. VIII The parties hereto *247 recognize that it may be desirable to acquire additional leases surrounding the described acre-age for protective purposes during the development herein contemplated. Any additional mutually agreed upon leases purchased would be shared on a pro-rata basis. IX It is understood and agreed that the Barr well will be drilled by H & R as an independent contractor, it being understood in the connection, that you are solely interested in the results to be obtained. You will not be a partner with H & R in such operation, and H & R agrees to indemnify and save you harmless from all claims and liabilities arising out of or in connection with the drilling and completion operation of the well to be drilled hereunder. H & R further agrees to pay all costs incurred in connection with same when due. X Nothing herein shall be construed as creating a partnership or joint venture between the parties hereto, but if for income tax purposes, the Contract Letter Agreement and the operations hereunder are regarded as a partnership, then each of the parties hereto elects to be excluded from the application of all of the provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue *248 Code of 1958 [sic] as permitted and authorized by Section 761 of said code and regulations thereunder. XI Notwithstanding anything contained herein to the contrary, it is specifically agreed and understood that in any assignment that H & R will make to you, in accordance with the terms and provisions of the agreement, that H & R shall warrant title to you, by through and under H & R only. ATTEST /s/ Jean M. Hickey / Secretary H & R OILS, INC. by /s/ Alex J. Hickey / President /s/ Wm. B. Scheidt The pertinent parts of the joint operating agreement which also was signed on December 29, 1973, provided: 5. DRILLING AND DEVELOPMENT OF LEASES: Operator in authorized to drill at the expense of the Joint Account any well on the Joint Leases required to meet the offset and reasonable development obligations, and all express obligations under the Joint Leases, and any well necessary in order to prevent the expiration or termination of any Joint Lease, without first securing the authority and approval of Non-Operators. Operator shall secure the written approval of Non-Operators before incurring against the Joint Account any item of expense, which item itself is in excess *249 of $2,500.00, except in the drilling, equipping and completion of a well covered by the next preceding paragraph or in the drilling, equipping and completion of a well as to which notice has been given as provided in the next succeeding paragraph and with respect to which well no Non-Operator has given notice that it does not desire to participate in the cost and expense of drilling. Before Operator commences operations at the cost of the Joint Account for the drilling of any well on the Joint Leases other than wells required to meet the offset and reasonable development obligations, and the express obligations under said Joint Leases, or wells necessary in order to prevent the expiration or termination of any Joint Lease, it shall give ten (10) days' written notice of its intention to commence operations for the drilling of the well to each of the Non-Operators, and should any Non-Operator or Non-Operators notify Operator, within five (5) days of the mailing to it or them of the notice, that it or they do not desire to participate in the cost and expense of drilling, completing and equipping the well, the costs and expenses thereof shall be borne by the Operator and the Non-Operators, *250 if any, not giving the notice, each bearing that portion of the costs which its interest in the Joint Leases bears to the total of the interests therein of Operator and Non-Operators participating in the drilling of the well; and if all Non-Operators give such notice, Operator may drill, complete and equip the well at Operator's cost and expense; provided, however, before any Non-Operator who elects not to participate in the cost and expense of drilling, completing, and equipping the well shall be entitled to any portion of the production therefrom Operator and the Non-Operators, if any, who participate in the cost of drilling, completing and equipping the well shall have the right to receive and shall receive currently out of the net proceeds of the sale of the portion of the production from the well belonging to each Non-Operator who does not participate in the cost and expense of drilling, completing, and equipping the well, double the amount of that portion of the cost which would have been borne by the non-participating Non-Operator, under the provisions hereof, had it participated in such cost and expense. The proceeds of the sale of the specified portion of the production shall *251 be allocated between Operator and Non-Operators, if any, who participate in the drilling of the well in proportion to their interest in the Joint Leases. The cost of operating such well or of reworking same shall be borne by the Joint Account. If the well is a dry hole, the salvage therefrom shall be owned by the Operator and Non-Operators, if any, participating in the drilling thereof in proportion to their several interests in the Joint Leases. The joint operating agreement incorporated an accounting procedure which, in its relevant parts, provided: I. GENERAL PROVISIONS 1. Definitions "Joint property" as herein used shall be construed to mean the subject area covered by the agreement to which this "Accounting Procedure" is attached. "Operator" as herein used shall be construed to mean the party designated to conduct the development and operation of the subject area for the joint account of the parties hereto. "Non-Operator" as herein used shall be construed to mean any one or more of the non-operating parties. 2. Statements and Billings Operator shall bill Non-Operator on or before the last day of each month for its proportionate share of costs and expenditures *252 during the preceding month. Such bills will be accompanied by statements, reflecting the total costs and charges as set forth under Subparagraph 'C' below: A. Statement in detail of all charges and credits to the joint account. B. Statement of all charges and credits to the joint account, summarized by appropriate classifications indicative of the nature thereof. C. Statements as follows: (1) Detailed statement of material ordinarily considered controllable by operators of oil and gas properties; (2) Statement of ordinary charges and credits to the joint account summarized by appropriate classifications indicative of the nature thereof; and (3) Detailed statement of any other charges and credits. 3. Payments by Non-Operator Each party shall pay its proportion of all such bills within fifteen (15) days after receipt thereof. If payment is not made within such time, the unpaid balance shall bear interest at the rate of six per cent (6%) per annum until paid. 4. Adjustments Payment of any such bills shall not prejudice the right of Non-Operator to protest or question the correctness thereof. Subject to the exception noted in Paragraph 5 of this section I, *253 all statements rendered to Non-Operator by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period Non-Operator takes written exception thereto and makes claim on Operator for adjustment. Failure on the part of Non-Operator to make claim on Operator for adjustment within such period shall establish the correctness thereof and preclude the filing of exceptions thereto or making of claims for adjustment thereon. The provisions of this paragraph shall not prevent adjustments resulting from physical inventory of property as provided for in Section VI, Inventories, hereof. 5. Audits A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the accounting hereunder for any calendar year within the twenty-four (24) month period following the end of such calendar year, provided, however, that Non-Operator must take written exception to and make claim upon the Operator for all discrepancies disclosed by the audit within said twenty-four *254 (24) month period. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. H & R drilled the Barr well. A determination that operating wells were commercially practicable was made. Accordingly, H & R completed the Barr well and drilled and completed the Gottschalk #1 well. The project was successful. The Gottschalk #1 produced about 52 barrels of oil an day. The Barr well also promised to be a successful producer. However, when preparing the well for production H & R induced too much fract pressure into the formation which caused it to lose its coherence. Accordingly, the Barr well could not produce oil. In 1974-1975, the investors and H & R considered expanding the scope of the operation. They decided, pursuant to section VIII of the 1973 agreement, to purchase an adjoining lease for protective purposes. This lease was the State Colorado River lease ("Colorado River lease"). In the last part of 1975 H & R held discussions with the investors concerning the drilling of two offset wells on the leases. H. & R's geologist *255 determined feasible spots to drill the offsets. One offset would be on the Colorado River lease. The other offset would be a second well on the Gottschalk lease. By the end of 1975 H & R and the investors decided in principle that drilling the offsets was a good idea. But H & R retained discretion as operator to decide if, when and how the wells would be drilled. On December 22, 1975, H & R issued an authorization for expenditure ("AFE") for each of the offset wells. These AFEs, when approved by the investors, authorized H & R to make expenditures in drilling the offsets. The AFEs also represented a call for the investors to decide if they wanted to participate in the offsets. An investor, under the 1973 agreement, did not have to participate in the additional development wells in order to retain his participation in the previously drilled wells. But in order to participate in the offsets an investor had to advance to H & R his share of the estimated costs of drilling the offsets (completion costs not included) within 30 days of the issuance of the AFEs. The AFEs requested $52,418 for the Colorado River well and $51,408 for the Gottschalk #2 well. The investors' shares were *256 as follows: Estimated Costs
Investor
Share
Colorado River
Gottschalk #2
W. Bryson
12.165%
$ 6,376.65
$ 6,253.78
R. Drewell
12.165%
6,376.65
6,253.78
J. Hickey
18.237%
9,559.47
9,375.28
J. Oden
12.165%
6,376.65
6,253.78
W. Scheidt
36.474%
19,118.94
18,750.55
H & R Oils
8.794%
4,609.64
4,520.83
$52,418.00
$51,408.00
The AFEs provided a breakdown of the estimated costs as follows: Colorado River
Gottschalk #2
Tangibles
Lease Costs
$ 1,010
Intangibles
Location Preparation
500
$ 500
Contract Drilling
4,200 ft. at $6.25/ft.
26,250
26,250
Drilling-Day Work-W.D.P.
70 hrs. at $83/hr.
5,810
5,810
Drilling-Day Work-W.O.D.P.
12 hrs. at $79/hr.
948
948
Surface Casing
200 ft. at $71/ft.
1,400
1,400
Surface Casing Cement
950
950
Electric Log & Density Log
1,700
1,700
Mud Logging
10 days at $200/day
2,000
2,000
Formation Testing
1,500
1,500
Water
350
350
Drilling Mud
8,500
8,500
Contingencies
500
500
Supervision and Expense
1,000
1,000
Total
$52,418
$51,408
Petitioner advanced $37,869.49 to H & R on December 26, 1975, as his share of the estimated expenses of *257 the offsets. Some, but not all, of the other investors advanced their share before the end of 1975. Petitioner responded to the AFEs as soon as he could for three reasons: (1) he wanted to make sure that he would participate in the offsets; (2) he wanted to take his IDC deduction in 1975 instead of in 1976; (3) he thought that funds had to be available to prepay a driller before H & R could secure a drilling rig. The venture would not have been hurt if some investors decided not to invest in the new wells. Because the Colorado River and Gottschalk #2 wells were offsets to already producing wells, H & R was willing to pay the share of any investor who dropped out and take over his interests in the new wells. Petitioner was not simply a passive investor in the venture. He held a mechanical engineering degree from Oklahoma State University, but he had little or no professional engineering experience. He spent his time pursuing real estate investments beginning in the 1950's and oil and gas investments beginning in 1972. Petitioner studied the geologic maps and discussed plans with H & R concerning the venture. He received an AFE for each well which had been drilled. He parsonally *258 estimated and calculated the prospective costs. On one occasion he returned an AFE to H & R to be recomputed because he found an error in it. Also, for the Barr and Gottschalk #1 wells he personally located and delivered the surface casing. In addition, he was present for the drilling of these two wells. Yet, petitioner had neither the training nor the experience of a professional petroleum engineer or geologist. In 1980 petitioner classified himself as relatively inexperienced in oil and gas matters even at that time. Petitioner relied on Hickey, the president of H & R, to make all ultimate decisions concerning whether, when, where and how to drill for oil on the venture's leases. H & R did not own drilling or well servicing equipment. H & R hired independent contractors to drill on a footage and daywork basis. It hired other contractors to service its wells. H & R merely supervised the drilling and servicing of its wells. H & R received $1,000 a well for supervising the operations. It did not markup the cost of hiring the independent contractors in charging the investors. Thus, H & R's income from the venture stemmed solely from the $1,000 per well supervision charge *259 and from the interests it held in the wells. The contracts into which H & R entered with the drillers and service companies provided that H & R would pay within 30 days after the invoice date. The contractors prepared the invoice only after the entire job was complete. Thus, there was no contract provision requiring payment before drilling or other services were performed. For example, payment on the drilling contracts was due only after the driller reached the contract depth. H & R entered into this type of contract with a driller during 1975 to govern the anticipated drilling of the Colorado River and Gottschalk #2 wells. H & R's usual practice was to pay the drillers and the service companies according to the terms of the contracts; that is, only upon receipt of the invoice following completion of the job. Accordingly, H & R usually put the amounts which it received from the investors prior to the drilling in its bank account pending the job's completion. If the estimated amount paid by the investors exceeded the actual amount due under the contracts, then the difference was refunded to the investors or applied to cover completion costs, if any. If the estimated amount *260 paid by the investors fell short of the actual amount due under the contracts, then the investors were billed after the job for the difference. The investors were also entitled to a refund of the entire prepaid amount if H & R decided not to drill the well for which the AFE was issued. Sometimes, however, H & R's procedure for paying the drillers was different. In these cases, if H & R received invested amounts at the end of a calendar year for a well which was supposed to be drilled in that year but which would not begin in that year, then H & R sometimes prepaid to the driller in that first year the pro rata share of the estimated drilling costs which was allocable to the investor who had prepaid. The contract did not require H & R to prepay those amounts. H & R did not lock in prices for the drilling by prepaying. The contract cost would be determined after the drilling was completed according to the contract footage and daywork rates. Neither did H & R ensure earlier rig supply by prepaying these amounts. H & R prepaid these amounts solely on the advice of its tax accountant in an attempt to assure its investors of IDC deductions in the year of investment rather than *261 in the year of drilling. H & R did not prepay the well servicing contractors in this way. Furthermore, H & R did not prepay in 1975 a pro rata amount for petitioner on the drilling contract related to the planned Colorado River and Gottschalk #2 wells. H & R and the investors hoped to start drilling at least one of the wells before the end of 1975. They contracted for a drilling rig on an "as available" basis. It appeared that the rig would be available in the final few days of 1975. However, the rig got stuck in mud and could not reach the Colorado River and Gottschalk leases. In January, 1976, production from the Gottschalk #1 well dropped from 52 barrels a day to 15 barrels a day. Petitioner accompanied an H & R employee to the well where they installed a new pump. With the new pump the well's production dropped to zero. As a result of this drop in production H & R exercised its discretionary right under the 1973 participation agreements not to drill the Colorado River and Gottschalk #2 wells. Accordingly, none of the IDC items for which petitioner advanced an estimated amount in 1975 was ever incurred by H & R. On March 9, 1976, H & R refunded to petitioner *262 the $37,869.49 advance which he made on December 26, 1976. Petitioners deducted the $37,869.49 advance as an IDC deduction on their 1975 income tax return. Petitioners recognized $37,869.49 in 1976 to reflect the refund of that amount by H & R. Respondent disallowed the $37,869.49 IDC deduction for 1975. Respondent asserted three reasons at trial for disallowing this deduction: (1) petitioner was not an operator with respect to the Colorado River lease as required by section 1.612-4, Income Tax Regs.; (2) the projected Colorado River lease cost and the projected surface casing costs for both planned wells were not IDC; and (3) the tax accounting rules prohibit the deduction of the December 26, 1975, advance as IDC in 1975. On brief respondent conceded that petitioner was an operator with respect to the Colorado River lease as required by section 1.612-4, Income Tax Regs.
OPINION The question in this case concerns the proper year for deducting IDC. Petitioner advanced $37,869.49 to H & R in anticipation of drilling two oil wells. We have found as a fact, and as hereinafter further discussed, that H & R did not prepay *263 any of the drilling or well servicing expenses. Under the drilling and service contracts, the costs would have become due after the completion of the work. None of the projected IDC work was done in 1975. In 1976 H & R cancelled the wells and refunded petitioner's advance. Respondent argues that the tax accounting rules prevent deduction of the $37,869.49 advance as IDC in 1975. In particular, respondent asserts that petitioners are not entitled to 1975 IDC deductions for the December 26, 1975, transfer to H & R because the prepayment was not paid pursuant to a legal obligation arising under a drilling or well servicing contract, because the prepayment and timing of the prepayment were motivated solely by federal income tax considerations and had no business purpose, because the prepayment was a deposit rather than a payment and because the deduction in 1975 created a material distortion of income in that year. Petitioner argues that he is entitled to the IDC deductions in 1975 because he advanced the estimated cost of anticipated IDC to H & R in 1975 and because he had to make this advance in order to participate in the venture. Petitioner's argument is inapposite. *264 The IDC deduction authorized by section 263(c)[1] and section 1.612-4, Income Tax Regs., is for IDC payments, not for advances to a venture which might incur IDC payments. We find that petitioner did not make an IDC payment when he advanced money to H & R. Under the 1973 agreement and its attached joint operating agreement and accounting procedure, H & R pooled advances from itself and individuals who wanted to participate in the proposed offset wells on the Colorado River and Gottschalk leases. H & R then would use the pooled funds to develop the leases. H & R was not itself obligated to drill the two offsets. It retained complete discretion to determine whether, when, where and how to develop the leases. On these facts we think that H & R was offering, at most, an opportunity to invest in the offset wells should H & R choose to drill them. The 1973 agreement underscores this limited nature *265 of petitioner's December i6, 1975, advance because of its distinction between H & R's obligations relating to the original Barr well and H & R's obligations concerning the subsequent development wells. Under the 1973 agreement H & R sold petitioner a three-eighths interest in the Barr lease and well. It also obligated itself to drill the Barr well on a turnkey basis to approximately 4,300 feet. The 1973 agreement details H & R's obligations in drilling the Barr well. Petitioner purchased the working interest and the turnkey drilling contract for $15,000. Thus, when petitioner paid $15,000 to H & R on December 29, 1973, he prepaid IDC to the extent allocable to the turnkey drilling obligation. By contrast, the investors, including H & R, were to share expenses on a pro rata basis for all subsequent development wells, such as the proposed offsets. H & R did not assume a turnkey obligation or any other drilling or servicing obligation with respect to these subsequent wells. The investors merely pooled their funds and shared the costs, risks and returns of the development wells on a pro rata basis. Accordingly, we find that petitioner did not make an IDC payment when he invested *266 his funds in a capital pool on December 26, 1975. Under the terms of this drilling program the IDC payments occurred only when H & R, on behalf of itself and the investors, purchased IDC items from drillers and service companies. Therefore, petitioners are entitled to IDC deductions in 1975 only to the extent, if any, that H & R made deductible IDC payments in 1975 to drillers and service companies on petitioner's behalf. The record contains no evidence that H & R prepaid in 1975 any amounts for the non-drilling items listed in the AFEs. Accordingly, petitioners failed to satisfy their burden of proving that IDC payments for these non-drilling items were made in 1975. Therefore, petitioners are not entitled to 1975 IDC deductions for these amounts. Rule 142(a). We also find that H & R did not prepay any drilling costs in 1975. Respondent served Hickey with a subpoena duces tecum in this case requiring Hickey to bring to the trial "all documents and records in your possession pertaining to transactions between H & R Oils, Inc. and William B. Scheidt concerning the drilling of two wells on the Otto Gottschalk lease and the State Colorado River lease." Hickey testified that *267 he was unable to comply with the subpoena duces tecum because "[w]e only keep our records between three and four years because of our limited office space." Consequently he was forced to testify entirely from memory except as to documents produced by the parties from other sources. Hickey testified that if H & R received invested amounts at the end of a calendar year for a well which was supposed to be drilled in that year but which would not begin in that year, then H & R sometimes would prepay the driller in that first year the pro rata share of estimated drilling costs which was allocable to the investor who had prepaid. However, no written or oral evidence was introduced regarding specific payments to any driller for the proposed Colorado River and Gottschalk #2 wells. Hickey flatly stated that "I do not remember whether this was paid to the drilling contractor or not. I sure don't." And again: Q. [by respondent's counsel, Mr. Simpson] You don't recall whether you paid -- actually paid this money over to the drilling contractor? A. No, I sure don't. This -- you know, this is so far back, it's been so many -- I really don't remember. Based on our review of the *268 entire record we do not think that H & R prepaid any amounts to the driller in 1975. Although Hickey provided some evidence that H & R sometimes prepaid an investor's pro rata share of drilling costs, the evidence is insufficient to find that H & R always made such payments or that it made such payments in 1975. We find Hickey's testimony inadequate for us to infer that H & R in fact prepaid petitioners' pro rata share to the driller in 1975. As there is no other evidence to support petitioners' position on this point we hold that they have failed to satisfy their burden of proof on this matter. Rule 142(a). Because we find that neither petitioner nor H & R made IDC payments or prepayments in 1975 concerning the proposed Colorado River and Gottschalk #2 wells we hold that petitioners are not entitled to 1975 IDC deductions related to these wells. Even were it to be assumed that H & R did in fact prepay the driller in 1975, such fact would not help petitioners because petitioners have not shown that such prepayments were "payments" instead of "deposits." A two-part test must be *269 applied to determine the proper year for deducting prepaid IDC, namely (1) whether the expenditure was a payment or a deposit; and (2) whether the prepayment produced a material distortion of income. Keller v. Commissioner,79 T.C. 7 (1982) (Court reviewed). In Keller we analyzed the distinction between payments and deposits as follows: The term "payment" has a special meaning for tax purposes. It does not mean a simple transfer of money by a taxpayer. Ernst v. Commissioner,32 T.C. 181 (1959). A transfer of money pursuant to a binding contract also is not enough. Owens v. Commissioner,64 T.C. 1, 18 (1975), affd. in part and revd. in part, 568 F.2d 1233 (6th Cir. 1977). A payment occurs only when the taxpayer's money is "irretrievably out of pocket." Ernst v. Commissioner, supra at 186. If, by express, implied or customary terms, a taxpayer retains a unilateral power to get the money back, then the money transfer is a "deposit" rather than a payment. Owens v. Commissioner,supra;Lillie v. Commissioner,45 T.C. 54 (1965) (Court Reviewed Opinion), *270 affd. 370 F.2d 562 (9th Cir. 1966); Mann v. Commissioner,483 F.2d 673 (8th Cir. 1973), revg. a Memorandum Opinion of this Court; Shippy v. United States,308 F.2d 743 (8th Cir. 1962). See Ward, Tax Postponement and the Cash Method Farmer: An Analysis of Revenue Ruling 75-152, 53 Texas L. Rev. 1119, 1123-1145 (1975). This rule prevents the possibility of taxpayer abuse which would occur if, in year one, a taxpayer transfers money to a third party and takes a deduction and, in year two, he compels a return of the money and cancels the transaction supporting the deduction. [79 T.C. at 29; footnote omitted.] Petitioners have the burden of proving that any prepayments which might have been made to the drillers by H & R were payments instead of deposits. Rule 142(a). Petitioners failed to provide us with a copy of any agreement governing the prepayments or with any other evidence indicating that the prepayments were payments rather than deposits. Furthermore, the record contains several indicia that the prepayments were in fact deposits. H & R cancelled the wells at its discretion and returned petitioner's *271 entire investment amount without deductions for penalties. This fact generates a strong inference that H & R had a unilateral power to compel a return of the prepaid amount. Also, the drilling contract did not require prepayments and the prepaid amount merely reflected an estimate of the amount which would be due upon completion of the job. Apparently, therefore, H & R voluntarily prepaid the drilling costs. Compare Bonaire Development Co. v. Commissioner,76 T.C. 789 (1981), affd. 679 F.2d 159 (9th Cir. 1982). In such a situation we are not convinced without further facts that H & R did not retain the power to compel a refund of the entire prepaid amount. Given this record we find that petitioner failed to prove that any amounts which might have been prepaid by H & R on the drilling contract were "irretrievably out of pocket." Ernst v. Commissioner,32 T.C. 181 (1959). Accordingly, we hold that any payments H & R might have made to the driller in 1975 would have been deposits on the drilling contract of IDC payments. Petitioners rely on Pauley v. United States, an unreported case ( S.D. Cal. 1963, 11 AFTR2d 955, 63-1 USTC par. 9280), *272 to support their position that they are entitled to deduct as IDC the $37,869.49 amount which they transferred to H & R on December 26, 1975. The Pauley court essentially based its decision on the finding that impelling business necessity motivated the prepaid IDC in that case. The court did not deal with the possibility that a prepayment might be a deposit instead of a payment. In Pauley the taxpayer prepaid IDC to a driller pursuant to a drilling contract. In our judgment, the crucial determination made by the district court in support of allowance of prepaid IDC was the following: During the course of negotiating the drilling contract, Pike Drilling Company had internal discussions concerning the manner of assuring itself of timely payments from Pauley. Prior to the subject drilling agreement, Pike Drilling Company had done little or no business with Pauley; however, they knew that Pauley was interested and involved in many other business activities. Pike Drilling Company was mainly concerned with Pauley's willingness to pay when Pike Drilling Company needed operating funds. Cash was always at a low ebb in the Pike Drilling Company. As a result of this concern *273 on the part of Pike Drilling Company, and during the course of several conferences with representatives of Pauley, it was agreed that Pauley would make an initial payment on the drilling contract of $95,000.00. It seems apparent from the above finding that the independent driller in Pauley neither would nor could have commenced drilling the well without first receiving the $95,000 -- an impelling business reason for prepayment. Respondent subsequently announced his acquiescence in the decision for the taxpayer, in Rev. Rul. 71-252, 1971-1 C.B. 146. Pauley, however, does not help petitioners because it is factually different. Pauley concerned IDC which was prepaid to the driller. As previously discussed, petitioner's December 26, 1975, advances to H & R did not constitute prepaid IDC. The IDC expenditures occurred only if and when H & R paid the driller or the service companies. The Pauley case, therefore, does not support 1975 deductions by petitioners because H & R failed to pay any amounts to the drillers or well servicing companies in 1975. We think that Pauley also is distinguishable concerning any amounts which H & R could be assumed *274 to have prepaid to the driller in 1975. The Pauley court was not asked to consider whether the questioned prepayments constituted deposits or payments. Therefore, its holding, which assumes that the prepayments were payments, would not bind the determination in this case where the prepayments were deposits. Furthermore, we note that H & R had no business purpose for prepaying the driller. Unlike the situation in Pauley, the drilling contract in this case did not require prepayment. Also, there is nothing in the record to indicate that the driller was short of cash or needed prepayments to provide capital with which to drill. Petitioner testified that it was his understanding that the driller had to be paid before drilling would begin. But this testimony was contradicted by Hickey. Because petitioner admitted that Hickey was the only source of his information we attach little significance to petitioner's testimony on this point. The facts of the case indicate that there was no business purpose for H & R to prepay the driller. H & R had a contract with the driller before prepayment which established the price and availability of a drilling rig. This contract provided *275 for payment after the completion of drilling. H & R achieved no new benefits, such as lower prices, locked in prices or accelerated supply of a rig, by prepaying. H & R simply prepaid to try to accelerate its investors' tax deductions to 1975 from 1976. Accordingly, we find that Pauley v. United States,supra, does not help petitioners in this case. It would be appropriate at this point also to mention Dillingham v. Umited States, an unreported case ( W.D. Okla. 1981, 48 AFTR2d 81-5815, 81-2 USTC par. 9601), which was decided after the parties submitted their briefs in this case, and which followed the Pauley approach in that the decision for the taxpayers was based upon a finding of business necessity without any discussion of the payment vs. deposit issue. The Dillingham case involved a tier partnership arrangement. The Drilling Partnership prepaid its sponsor, Basin Petroleum Corp., to drill certain oil and gas wells under turnkey contracts. The payments constituted prepaid IDC which the district court allowed as deductions in the year of payment. The drilling contracts required prepayment. The Dillingham court found that "[a] principal *276 reason for the prepayment requirement was to provide Basin with working capital for the drilling of wells and to temporarily provide funds to Basin for other operations. This was a legitimate business arrangement and not merely a sham to permit the deduction of IDC's in a particular year." As discussed above with reference to the Pauley case, this holding does not help petitioners because of the different issues and facts presented by this case. We have determined on the facts of this case that H & R made no IDC payments in 1975. Accordingly, we hold that petitioners are not entitled to deduct as IDC in 1975 any part of the $37,869.49 amount which petitioner advanced to H & R on December 26, 1975.This conclusion obviates the need to consider respondent's other arguments. Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended during the year in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩