ROBERT J. FRYSINGER and MILDRED FRYSINGER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Frysinger v. Commissioner
Docket No. 11597-78.
United States Tax Court
T.C. Memo 1980-89; 1980 Tax Ct. Memo LEXIS 498; 39 T.C.M. (CCH) 1287; T.C.M. (RIA) 80089; March 24, 1980, Filed Robert C. Walthall, for the petitioners. Linda Wise, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined a deficiency of $9,338.76 in petitioners' 1975 Federal income tax. The sole issue for decision is whether petitioner Robert J. Frysinger is entitled to a deduction in 1975 for an expenditure in 1975 of $22,230 for cattlefeed to be consumed in 1976. FINDINGS OF FACT Some of the facts were stipulated and are found accordingly. At the time of filing their petition herein, Robert J. Frysinger (hereinafter petitioner) and his wife, Mildred Frysinger, resided in Birmingham, Ala.
During 1975, petitioner was the treasurer for the Southern area of the United States Steel Corporation. In May or June of 1975, when petitioner became interested in financial planning and investing he sought advice from *500 Southern Financial Services (Southern Financial). After meeting with petitioner, Southern Financial recommended that petitioner consider investing in a cattlefeeding operation managed by Rimrock Cattle Company (Rimrock) of Amarillo, Tex. Petitioner was introduced to several people from Rimrock by Southern Financial and, after several discussions with these people, petitioner became very interested in buying and selling cattle asan investment. On December 16, 1975, petitioner entered a cattle management contract with Rimrock under the terms of which Rimrock agreed to purchase cattle for petitioner, raise them to slaughter weight, and then sell them for petitioner's account. The pertinent provisions of this contract were as follows: CATTLE MANAGEMENT SERVICE AGREEMENT
THIS AGREEMENT made and entered into by the between RIMROCK CATTLE COMPANY (hereinafter referred to as "Rimrock"), and [signed] Robert J. Frysinger, (hereinafter referred to as "Owner"); WITNESSETH: WHEREAS, Owner is desirous of entering into the cattle feeding business, and further is desirous of obtaining the services of experienced management which Rimrock has to offer; and WHEREAS, Rimrock *501 is in the cattle feeding business and manages several investor cattle feeding businesses; and WHEREAS, Owner believes that the expertise of Rimrock is material in the profitability of cattle feeding; NOW, THEREFORE, IT IS AGREED AS FOLLOWS: 1. Owner employs Rimrock, and Rimrock hereby agrees, to purchase and provide for the shelter and maintenance, at such locations as are deemed reasonable and expedient by Rimrock in the performance of this agreement, including but not limited to rented pasturage, holding pens and lots, and other suitable places, a certain number of cattle for Owner's account upon the terms and conditions of this agreement; such cattle to be maintained and fed by Rimrock at such places as are deemed reasonable and expedient by Rimrock in the performance of this agreement, to slaughter weights then prevailing in the cattle industry. 2. The cattle to be fed by Rimrock shall be purchased by Rimrock for Owner's account, and upon attaining slaughter weights, such cattle shall be sold for Owner's account by Rimrock, all in accordance with the terms and conditions of this agreement; provided, however, that Rimrock may sell such cattle prior to attaining slaughter *502 weights if, in the best judgment of Rimrock, such sale would be in the best interests of Owner. * * *
6. All cattle purchased for Owner shall be the property of Owner from time of purchase, and Owner or its designated representative shall be provided all appropriate documents of title. * * *
11. The Owner shall, in the implementation and performance of this agreement, be responsible for and bear the following costs and expenses incurred by Rimrock on Owner's behalf, or for Owner's account in connection with Owner's cattle: (a) Purchase cost of cattle, including a standard commission then prevailing in the cattle industry incurred in acquiring such cattle, freight charges, and all other incidental charges to feedlots. Cattle shall be purchased directly for the account of Owner when practical; however, should cattle be purchased by Rimrock and then sold to Owner, such sale shall be at Rimrock's cost. (b) Cost of all feed as determined by Rimrock, including all supplements, additives or other ingredients added thereto, consumed by Owner's cattle. * * *
13. Rimrock will, at Owner's request, negotiate and arrange for owner's financing of Owner's feeding program *503 on the best terms available with a lending institution to be selected by Rimrock upon execution of the power of attorney attached hereto and marked Exhibit "A." * * * 14. All costs and expenses to be incurred by Owner in the implementation and performance of this agreement will be paid to Rimrock as follows: (a) Cattle purchased by Rimrock for Owner's account shall be paid by bill of sale draft, drawn by Rimrock or Rimrock's designated representative on Owner's account at the lending institution selected by Rimrock or Rimrock's designated representative on Owner's account at the lending institution selected by Rimrock or designated by Owner and presented for payment on said lending institution. * * *
16. This agreement shall be for the period of time necessary to purchase and sell 2 (turns) of cattle. * * *
As the contract indicates, petitioner anticipated buying and feeding two turns or pens of cattle consisting of 120 cattle each. [1] To finance the purchase of these cattle as well as the feed, petitioner made arrangements to borrow money from the First National Bank of Amarillo (First National.) First National gave petitioner a line of credit against which draws *504 for the purchase of cattle could be made. As part of the loan arrangement, petitioner gave Rimrock the power of attorney to draw on this line of credit to purchase cattle. Petitioner anticipated that Rimrock would purchase the cattle for his feeding operation in late 1975 or early 1976. Under the terms of the contract, petitioner was required to purchase the cattlefeed. Rimrock advised petitioner that the price of corn used to feed cattle was traditionally lowest at the end of the year. This trend in corn prices is reflected in the two tables set out below. Table I shows the prices of corn for the period October 1965 through September 1976 on the Chicago grain market, and Table II shows the average prices of corn in the Texas High Plains, an area around Amarillo, Tex., in December and January for the years 1968 through 1976: Table 1
CASH PRICES FOR CORN NO. 2 YELLOW - CHICAGO (PER BUSHEL)
Year
Beginning
Oct.
Oct.
Nov.
Dec.
Jan.
Feb.
Mar.
1965
1.23
1.16
1.24
1.32
1.31
1.28
1966 1.40
1.35
1.45
1.42
1.41
1.41
1967
1.17
1.10
1.14
1.13
1.15
1.17
1968
1.09
1.15
1.16
1.20
1.18
1.17
1 969
1.21
1.18
1.19
1.26
1.26
1.24
1970
1.42
1.42
1.54
1.59
1.57
1.55
1971
1.10
1.07
1.22
1.22
1.21
1.2 2
1972
1.32
1.33
1.57
1.58
1.59
1.59
1973
2.37
2.50
2.68
2.90
3.13
2.99
1974
3.74
3.48
3.47
3.19
2.96
2.90
1975
2.74
2.59
2.59
2.62
2.70
2.68
*505 Year
Beginning
Apr.
May
June
July
Aug.
Sept.
1965
1.28
1.31
1.33
1.43
1.49
1.46
1966
1.38
1.39
1.38 1.31
1.23
1.20
1967
1.16
1.19
1.15
1.13
1.08
1.09
1968
1.24
1.32
1.31
1.29
1.30
1.24
1969
1.28
1.32
1.3 7
1.38
1.46
1.52
1970
1.51
1.52
1.57
1.48
1.29
1.16
1971
1.26
1.28
1.25
1.29
1.29
1.40
1972
1.65
2.01 2.42
2.52
2.91
2.47
1973
2.69
2.70
2.93
3.35
3.63
3.55
1974
2.96
2.82
2.89
2.95
3.12
2.99
1975
2.68
2.84
2.96
2.96
2.87
2.77
Table 2
Texas High Plains
Average Cash Prices for Corn
(Per Bushel)
December
1968
1.06
January
1969
1.08
December
1969
1.18
January
1970
1.19
December
1970
1.29
January
1971 1.31
December
1971
1.26
January
1972
1.26
Decemer
1972
1.73
January
1973
1.68
December
1973
2.61
January
1974
2.69
December
1974
3.12
January
1975
2.87
December
1975
2.53
January
1976
2.57
Thus, to obtain the lowest price possible for the corn to be used in his feeding operation during 1976, on December 30, 1975, petitioner purchased 450,000 pounds of No. 2 yellow corn for $22,230. *506 Petitioner paid for the corn by cashier's check on this same day. The corn was stored in a bonded warehouse subject to delivery at Rimrock's request. Since it generally takes five to six months and 2,500 to 3,000 pounds of corn to fatten a feeder steer to slaughter weight, petitioner and Rimrock anticipated that the entire 450,000 pounds of corn would be consumed in 1976, in the process of feeding two pens of cattle. In May 1976, Rimrock purchased 117 feeder cattle for petitioner. These cattle were paid for by Rimrock with a livestock bill of sale draft drawn on petitioner's account at First National. In October 1976, all 117 cattle were sold by Rimrock for petitioner. Petitioner sustained a loss on this sale because the price of cattle in October 1976 was less than the price at which petitioner had purchased the cattle in May 1976. As a result of this decline in the price of cattle, petitioner did not purchase a second pen of cattle during 1976. Consequently, at the close of 1976, petitioner had 120,000 pounds of corn on hand. This remaining corn was eventually used by petitioner during 1977 in another cattlefeeding operation. During 1975, petitioner used the cash *507 receipts and disbursements method of accounting. Accordingly, on his 1975 Federal income tax return, petitioner deducted the $22,230 that he paid for cattlefeed in 1975 as a farm expense. Respondent in his statutory notice disallowed the deduction in its entirety on the ground that it resulted in a material distortion of income. At trial, respondent filed a written amendment to his answer in which he stated that in addition to creating a material distortion of income, petitioner's deduction for the purchase of cattlefeed was disallowed because the purchase was made for tax avoidance purposes rather than for business purposes. OPINION The only issue we must decide is whether petitioner is entitled to a deduction in 1975 for an expenditure in 1975 of $22,230 for cattlefeed to be consumed in 1976. Respondent's disallowance of petitioner's deduction in 1975 for cattlefeed purchased in that year is based on Rev. Rul. 79-229, 1979-31 I.R.B. 7. In that ruling, respondent takes the position that farmers reporting on the cash receipts and disbursements method of accounting may deduct under section 162 [2] in the taxable year paid, amounts for livestock feed to be consumed *508 in a subsequent taxable year only if the following three tests are satisfied: (1) the expenditure for the feed must be a payment, rather than a deposit; (2) the prepayment must be made for a business purpose and not merely for tax avoidance; and (3) the deduction of such costs in the taxable year of prepayment must not result in a material distortion of income. Respondent here contends that petitioner failed to meet the second and third tests, and that therefore petitioner was only entitled to deduct the cost of the feed as it was consumed. Petitioner, relying on our recent decision in Van Raden v. Commissioner,71 T.C. 1083 (1979), on appeal (9th Cir., Sept. 18, 1979), contends that the business purpose of the prepayment was to secure the lowest price possible for cattlefeed and that no material distortion of income resulted from the prepayment because as a farmer using the cash receipts and disbursements method of accounting, petitioner was entitled to deduct the cost of the cattlefeed in the year purchased. In Van Raden v. Commissioner,supra, *509 the taxpayers, as limited partners, invested in a cash basis partnership cattlefeeding operation in December 1972. During the last few days of 1972, the partnership purchased a one-year supply of feed and some cattle. The taxpayers, who used the cash method of accounting, deducted their distributive shares of the cost of the feed on their 1972 returns. The Commissioner disallowed the deductions for the feed expense on the grounds that there wAs no business purpose for the prepayment and that the deduction caused a material distortion in the income of the taxpayers for 1972. The issue before the Court was whether the taxpayers were entitled to deduct the cost of the feed in the year of purchase or whether the Commissioner could in effect put cash basis farmers on the inventory method for this one item by limiting the deduction of feed expenses to the year in which the feed was consumed. The Court concluded that the taxpayers met both the business purpose test and distortion of income test and, therefore, held that the cost of the feed was deductible in the year of purchase. With respect to the business purpose test, the Court found that the primary purpose of the prepayment *510 was to secure a year's supply of feed at the best possible price. The Court concluded that although favorable tax consequences may have resulted from the prepayment, the primary purpose was a business purpose and not tax avoidance. In holding that no material distortion of income resulted from the prepayment, the Court acknowledged that the cash method of accounting usually results in some distortion of income because the benefits derived from payments for expenses or materials extend to varying degrees into more than one annual accounting period. The Court, however, concluded that if the cash method is consistently utilized and no attempt is made to unreasonably prepay expenses or purchase supplies in advance, the distortion is not material and over a period of years the distortions will tend to cancel out each other. We believe our decision in Van Raden v. Commissioner,supra, is controlling here. Hence, for the reasons set forth below, we conclude that petitioner satisfied both the business purpose test and the distortion of income test and, therefore, petitioner is entitled to a deduction in 1975 for the cattlefeed he purchased in 1975. Business *511 Purpose v. Tax Avoidance
Although petitioner and respondent agree that a farmer [3] is entitled to deduct feed costs as an ordinary and necessary business expense, [4] they disagree as to the proper year for the deduction. Petitioner's purchase of cattlefeed on December 30, 1975, raises to question of whether the purchase at that time had a business purpose or was merely for tax avoidance. Thus, the focus of the business purpose test is the timing of the deduction. To determine whether petitioner's prepayment had a business purpose, we must look at all of the facts and circumstances because business purpose is a question of fact. Gregory v. Helvering,293 U.S. 465, 469-470 (1935); Van Raden v. Commissioner,supra at 1097. Generally, a business purpose for a prepaid feed expense will be found to exist where the taxpayer reasonably expects a business benefit from the prepayment suc as fixing the maximum price, securing an assured feed supply, or securing preferential treatment in anticipation of a feed shortage. Cravens v. Commissioner,272 F.2d 895, 899 (10th Cir. 1959); Van Raden v. Commissioner,71 T.C. 1083, 1101 (1979); *512 Ernst v. Commissioner,32 T.C. 181, 186 (1959). See also Rev. Rul. 79-229, 1979-31 I.R.B. 7. During 1975 petitioner became interested in buying and selling cattle as an investment. He *513 was advised to consider investing in a cattle feeding operation managed by Rimrock in Amarillo, Tex. In December 1975, petitioner entered a cattle management contract with Rimrock in which Rimrock agreed to purchase cattle for petitioner, raise them to slaughter weight, and then sell them for petitioner's account. Under the terms of the contract, petitioner was required to buy the cattlefeed. Rimrock advised petitioner that the price of corn used to feed cattle was traditionally lowest at the end of the year. This trend in corn prices is reflected in the two tables set out in our findings of fact. Table I shows the prices of corn for the period October 1965 through September 1976 on the Chicago Grain Market and Table II shows the average prices of corn in the Texas High Plains in December and January for the years 1968 through 1976. In comparing the corn prices in December to the succeeding month of January on the Chicago market, we find that out of the 11 years, in 7 years the December prices were lower than the January prices, in 1 year the December and January prices were equal, and in 3 years the December prices were higher than the January prices. In comparing the corn prices *514 in December to the succeeding month of January in the Texas High Plains, we find that out of the 8 years, in 5 years the December prices were lower than the January prices, in 1 year the December and January prices were equal, and in 2 years the December prices were higher than the January prices. Taking into account this trend in year-end corn prices and all the other facts and circumstances, we conclude that petitioner purchased cattlefeed in December 1975 based on the reasonable expectation of obtaining a business benefit from the lowest possible feed price. We therefore hold that the primary purpose of petitioner's prepayment of the feed expense was a business purpose and not tax avoidance. See Van Raden v. Commissioner,supra.
Distortion of Income
The distortion of income test is based upon section 446(b) of the Code which provides: (b) Exceptions.--If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, or his delegate, does clearly reflect income. Section 446(b) is an exception *515 to section 446(a) which states the general rule that taxable income shall be computed under the method of accounting on the basis which the taxpayer regularly computes his income in keeping his books. Section 461(a) provides that deductions shall be taken by the taxpayer in the taxable year that is proper under the method of accounting used in computing taxable income. Section 1.471-6(a), Income Tax Regs., states that a farmer has an option to use the cash receipts and disbursements method or the inventory method of accounting. Section 1.461-1(a)(1), Income Tax Regs., provides that under the cash method, which petitioner used here, expenses are generally deductible in the year paid. However, section 1.461-1(a)(1) also provides that "if an expenditure results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year, such an expenditure may not be deductible, or may be deductible only in part, for the taxable year in which made." A determination by the Commissioner that a taxpayer's method of accounting does not clearly reflect income will not be overturned by the court unless the taxpayer establishes that the Commissioner *516 abused his discretion. Sandor v. Commissioner,62 T.C. 469, 477 (1974), affd. per curiam 536 F.2d 874 (9th Cir. 1976). Whether an accounting method clearly reflects or materially distorts income is a question of fact. Resnik v. Commissioner,555 F.2d 634, 636 (7th Cir. 1977), affg. per curiam 66 T.C. 74 (1976); Van Raden v. Commissioner,supra, at 1104. In the present case, respondent based his determination that petitioner's prepayment of the feed expense resulted in a material distortion of petitioner's income on several factors. To begin with, respondent claims that since petitioner had farm expenses but no farm income in 1975, the reduction of petitioner's 1975 non-farm income by his farm expenses created a gross distortion of income. Respondent also considered the time of the feed purchase, December 30, 1975, significant because no cattle were purchased until May 1976. Further, respondent's view that petitioner's purpose in purchasing the feed at the close of 1975 was tax avoidance also contributed to the conclusion that there was a material distortion of petitioner's 1975 income. In determining *517 whether a prepaid feed expense created a material distortion of income, the Court in Van Raden said: Because the method of accounting and the nature of the trade or business are so interdependent, we conclude that the distortion of income must not be examined in a vacuum but in light of the business practice or business activities which give rise to the transaction which the Commissioner has determined must be accorded a different accounting treatment. For example, material distortions of income may occur if the sales force of a business is more successful in December than in January, yet such a distortion would not require adjustment to clearly reflect income because the distortion resulted from the business activity itself. Should the result be different if the taxpayer purchases a year's supply of its primary cost item at its lowest cost consistently from year to year? We do not think so. In short, a substantial legitimate business purpose satisfies the distortion of income test. We recognized this implicitly in Sandor v. Commissioner,supra.See Stokes v. Commissioner,22 T.C. 415 (1954); Maple Leaf Farms, Inc. v. Commissioner,64 T.C. 438 (1975); *518 Hi-Plains Enterprises, Inc. v. Commissioner,60 T.C. 158 (1973), affd. 496 F.2d 520 (10th Cir. 1974). [Van Raden v. Commissioner,supra at 1105-1106.] Since we have found that the primary purpose of petitioner's prepayment was a business purpose, we do not believe that petitioner's lack of farm income or the timing of the feed purchase, created a material distortion of petitioner's 1975 income. Respondent also based his determination that the prepayment resulted in a material distortion on the contention that under section 1.461-1(a)(1), Income Tax Regs., the cattlefeed purchased by petitioner was "an asset having a useful life which extends substantially beyond the close of the taxable year" and therefore the cost of the feed must be prorated over the period during which the feed is consumed. Cf. Clement v. United States,580 F.2d 422 (Ct. Cl. 1978), cert. denied 440 U.S. 907 (1979). This argument was rejected by the Court in Van Raden and for the reasons stated in Van Raden we reject it here. See Van Raden v. Commissioner,71 T.C. 1083, 1107-1108 (1979). To reflect *519 the foregoing, Decision will be entered for the petitioner. Footnotes
1. In paragraph 16 of the contract, a pen of cattle was referred to as a "turn" of cattle.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, and in force during the year in issue.↩
3. Sec. 1.61-4(d), Income Tax Regs., provides in part as follows: [the] term "farm" embraces the farm in the ordinarily accepted sense, and includes stock, dairy, poultry, fruit, and truck farms; also plantations, ranches, and all land used for farming operations. All individuals, partnerships, or corporations that cultivate, operate, or manage farms for gain or profit, either as owners or tenants, are designated as farmers * * *. The parties do not disagree that petitioner qualifies as a "farmer" for Federal tax purposes under this definition. ↩
4. Sec. 1.162-12(a), Income Tax Regs., provides in part as follows: A farmer who operates a farm for profit is entitled to deduct from gross income as necessary expenses all amounts actually expended in the carrying on of the business of farming. * * * The purchase of feed and other costs connected with raising livestock may be treated as expense deductions insofar as such costs represent actual outlay * * *.↩