JACK J. GRYNBERG AND CELESTE GRYNBERG, PETITIONERS
v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3688–80, 25073–81, 24307–82.     Filed August 27, 1984.

*Carl A. Polsky, Daniel E. Farmer*, and *Jonathan D. Sokoloff*, for the petitioners.
*William F. Garrow*, for the respondent.

SWIFT, *Judge*: In these consolidated cases respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Year | Deficiency | Year | Deficiency |
|------|-----------|------|-----------|
| 1974 | $82,814 | 1977 | $214,745 |
| 1975 | 139,461 | 1978 | 92,550 |
| 1976 | 262,981 | 1979 | 8,215 |

The parties have reached a partial settlement, and the only issues for decision are (1) whether petitioners can revoke their elections under section 170(b)(1)(D)(iii)[1] for 1974 and 1975 with respect to their charitable contributions of capital gain property, and (2) whether deductions claimed by petitioners for advance payments of delay rental on oil and gas leases were

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years at issue. Note that sec. 170(b)(1)(D)(iii), which was in effect during the years in issue, is now found in sec. 170(b)(1)(C)(iii).

proper.[2] These issues were submitted fully stipulated. The stipulation of facts and exhibits are incorporated herein by reference.

## FINDINGS OF FACT

Petitioners are husband and wife who resided at Englewood, CO, at the time the petitions were filed. Petitioners timely filed their joint Federal income tax returns for 1974 through 1979. For convenience, we will set forth the facts relating to each issue separately.

### Charitable Contribution Elections

In 1974, petitioners donated 20,000 shares of common stock of Oceanic Exploration Co., Inc., to the Allied Jewish Federation of Denver, a charitable organization qualified under section 170(b)(1)(A)(vi). The undisputed value of the stock was $667,500. In 1975, petitioners donated an additional 35,000 shares of common stock of the same company to the same charity. The undisputed value of those shares was $332,500. Since the donations consisted of capital gain property, petitioners had to determine which of two permissible methods under section 170 they would use in calculating, for Federal income tax purposes, the charitable contribution deductions with respect to those donations.

Under section 170, a taxpayer has two methods of calculating the amount of a charitable contribution deduction with respect to donations of capital gain property. The charitable contribution deduction can be calculated on the basis of the fair market value of the capital gain property which was donated, subject to a limit of 30 percent of the taxpayer's adjusted gross income with any remainder carried over to subsequent years. See sec. 170(b)(1)(D)(i), (b)(1)(F), and (d)(1). Alternatively, the charitable contribution deduction can be calculated on the basis of the fair market value of the capital gain property which was donated, reduced by 50 percent of the amount which would have been long-term capital gain if the property had been sold at its fair market value, subject to a

---

[2] A third issue, concerning the proper allowance depletion under sec. 613A, was severed from those addressed herein because that same issue was pending before the Supreme Court of the United States in unrelated cases.

limit of 50 percent of the taxpayer's adjusted gross income with any remainder carried over to subsequent years. See sec. 170(b)(1)(D)(iii) and (e)(1)(B).

In computing the amount of the charitable contribution deductions claimed on their 1974 and 1975 Federal income tax returns, petitioners used the second method (i.e., the fair market value of the Oceanic Exploration Co. stock donated to the charity each year by petitioners was reduced by 50 percent of the excess of the fair market value of that stock over petitioners' basis in the stock). Those amounts were claimed as charitable contribution deductions on petitioners' tax returns, subject to the limit of 50 percent of their adjusted gross income in each year.

In a notice of deficiency dated December 17, 1979, respondent made adjustments to petitioners' returns for 1974 and 1975, as follows:

|     |                                    | 1974        | 1975      |
| --- | ---------------------------------- | ----------- | --------- |
| (a) | Partnership income                 | $94,152     | 0         |
| (b) | Legal and professional fees         | 2,474       | $1,520    |
| (c) | Travel and entertainment expense    | 8,517       | 1,456     |
| (d) | Lease rental                        | 0           | 22,426    |
| (e) | Delay rentals                       | 194,694     | [66,192]  |
| (f) | Consulting fees                     | 0           | 2,617     |
| (g) | Depletion                           | 0.          | 261,272   |
| (h) | Ordinary gain on sale of assets     |             | [6,403]   |
| (i) | Net gain on sale of capital assets  | 0           | 1,709     |
| (j) | Contributions                       | [149,918]   | 14,952    |

Item "j" above (viz, the adjustments to "contributions") reflects mechanical adjustments which were caused by other unrelated adjustments which increased petitioners' adjusted gross income and therefore increased the charitable contribution deduction limits for each year. The amount allowable as a charitable contribution deduction for 1974 increased because petitioners' adjusted gross income for 1974 increased. The amount allowable as a charitable deduction for 1975 decreased due to the increased deduction allowed for 1974, resulting in a smaller charitable contribution deduction carryover to 1975. In making the recalculations of petitioners' charitable contribution deductions for 1974 and 1975, respondent utilized the same method of determining petitioners' charitable contribu-

tion deductions with respect to the contributions of the appreciated stock that petitioners utilized on their tax returns.

In 1981, petitioners requested that the elections they made on their 1974 and 1975 tax returns in calculating their charitable contribution deductions under section 170(b)(1)(D)(iii) be revoked and requested that the deductions be recalculated under section 170(b)(1)(D)(i).

## Prepayments of Delay Rental

During the years 1974 through 1979, petitioners owned several hundred oil and gas leases acquired from the United States Government, from various State governments, and from private lessors. The properties subject to the leases were located in several states, including Colorado, Michigan, New Mexico, Utah, and Wyoming.

Under the lease provisions, petitioners were entitled to search for, extract, and sell oil and gas from the properties. Petitioners, however, were also obligated to pay to the lessors a specified annual fee with respect to each lease unless certain conditions enumerated in the various leases were satisfied, such as the commencement of drilling operations or the discovery of specified quantities of oil or gas. This annual fee was referred to as "delay rental." The purpose of delay rental was to compensate the lessor for the delay in the development of drilling or production operations on the properties subject to the leases. Payments of delay rental prevented termination of the leases where drilling or production operations had not commenced. Failure to pay delay rental due on a particular lease would result in automatic termination of the lease.

Depending on the provisions of each lease, delay rental payments were due on the first day of the anniversary month, on the second day of the anniversary month, or on some other day during the anniversary month. From 1971 to the present time, petitioners have paid delay rental due each year during the months of April through December on or about the first day of the month preceding the anniversary month. For example, if a delay rental payment were due sometime in the month of July, petitioners would make payment thereof on or about the first of June. However, from 1971 to the present time, in addition to the delay rental due in the following January, petitioners have prepaid in December of each year

delay rental which did not become due until the following February and March.[3]

Petitioners were calendar year taxpayers and utilized the cash receipts and disbursements method of accounting (hereinafter referred to as the cash method) for Federal income tax purposes. They deducted the delay rental paid in December with respect to lease anniversary dates occurring in February and March of the following year.

During the years 1974 through 1979, petitioners made the following prepayments of delay rental with respect to lease anniversary dates occurring in February and March of the following year:

| Payment date | Amount | Lease anniversary month |
|---|---|---|
| 12/27/74 | $63,200.24 | February 1975 |
| 12/27/74 | 59,051.13 | March 1975 |
| 12/31/75 | 68,607.18 | February 1976 |
| 12/31/75 | 59,894.20 | March 1976 |
| 12/15/76 | 60,877.50 | February 1977 |
| 12/15/76 | 3,358.50 | March 1977 |
| 12/15/77 | 47,175.00 | February 1978 |
| 12/22/78 | 48,096.00 | February 1979 |
| 12/29/78 | 48,674.00 | March 1979 |
| 12/15/79 | 43,846.00 | February 1980 |
| 12/24/79 | 41,731.00 | March 1980 |

OPINION

*Charitable Contribution Elections*

As previously explained, section 170(b)(1)(D)(iii)[4] permits

---

[3]Delay rental due in April of 1975 also was prepaid by petitioners in December of 1974, and in December of 1977, petitioners prepaid delay rental due only for January and February of 1978. Respondent has conceded the deductibility of delay rental payments made in December with respect to lease anniversary dates occurring in the following January, and petitioner has conceded the nondeductibility of delay rental payments made in December of 1974 with respect to lease anniversary dates occurring in April 1975. Therefore, only the prepayments made in each December of 1974 through 1979 of delay rental due the following months of February and March remain in issue herein.

[4]Sec. 170(b)(1) provides in relevant part as follows:

(D) Special limitation with respect to contributions of certain capital gain property.—

*     *     *     *     *     *     *

(iii) At the election of the taxpayer (made at such time and in such manner as the Secretary or his delegate prescribes by regulations), subsection (e)(1) shall apply to all contributions of capital gain property (to which subsection (e)(1)(B) does not otherwise apply) made by the taxpayer

taxpayers to elect the method they wish to use in calculating the amount of the charitable contribution deduction to be claimed with respect to donations of capital gain property. That section, however, expressly grants respondent the authority to establish by regulation the time by which and the manner in which the election is to be made. The regulations promulgated under this section provide that the election is to be made "by attaching to the income tax return for the election year a statement indicating that the election under section 170(b)(1)(D)(iii) * * * is being made."[5]

Respondent argues that changes in the election, after the due date of the original return, would cause a burden on the administration of the tax laws and that under the doctrine of election, petitioners are bound by their original elections and are precluded from revoking the elections made on their original returns. Respondent alternatively contends that the language "tax return" in the regulation is to be interpreted to mean the original tax return filed and therefore that elections under section 170(b)(1)(D)(iii) can only be made on the original return.

Petitioners argue that the doctrine of election is an outmoded, equitable doctrine that should not apply in this case and that even if it were a viable doctrine, it is inapplicable here since their original elections were based on a mistake of fact. Petitioners further contend that the legislative policy underlying the changes made by the Tax Reform Act of 1969 (83 Stat. 550) to the rules applicable to charitable contribution deduc-

---

during the taxable year. If such an election is made, clauses (i) and (ii) shall not apply to contributions of capital gain property made during the taxable year, and, in applying subsection (d) (1) for such taxable year with respect to contributions of capital gain property made in any prior contribution year for which an election was not made under this clause, such contributions shall be reduced as if subsection (e)(1) had applied to such contributions in the year in which made.

[5]Sec. 1.170A-8(d)(2), Income Tax Regs., provides in relevant part as follows:

(iii) *Manner of making election.* The election under subdivision (i) of this subparagraph shall be made by attaching to the income tax return for the election year a statement indicating that the election under section 170(b)(1)(D)(iii) and this subparagraph is being made. If there is a carryover to the taxable year of any charitable contributions of 30-percent capital gain property from a previous taxable year or years, the statement shall show a recomputation, in accordance with this subparagraph and sec. 1.170A-4, of such carryover, setting forth sufficient information with respect to the previous taxable year or any intervening year to show the basis of the recomputation. The statement shall indicate the district director, or the director of the internal revenue service center, with whom the return for the previous taxable year or years was filed, the name or names in which such return or returns were filed, and whether each such return was a joint or separate return.

tions supports their position. Petitioners also contend that the words "tax return" in the regulation do not necessarily mean the original tax return.

The doctrine of election as it applies to Federal tax law consists of the following two elements: (1) There must be a free choice between two or more alternatives, and (2) there must be an overt act by the taxpayer communicating the choice to the Commissioner, i.e., a manifestation of choice. *Bayley v. Commissioner*, 35 T.C. 288, 298 (1960); *Burke & Herbert Bank & Trust Co. v. Commissioner*, 10 T.C. 1007, 1009 (1948), and 10 J. Mertens, Law of Federal Income Taxation, sec. 60.19, at 73 (1976 rev.). It is appropriate to note at this point that the doctrine of election is a viable, healthy doctrine applicable to elections made under the tax laws. "The Supreme Court's decision in *Pacific National Co. v. Welch*, 304 U.S. 191 [1938], is often regarded as the fundamental authority for the development of this law." *Estate of Stamos v. Commissioner*, 55 T.C. 468, 473 (1970). Indeed, the principles applied in *Pacific National* have enjoyed widespread application. *Estate of Stamos v. Commissioner, supra* at 474.

In a recent opinion, this Court succinctly reiterated the *Pacific National* rule: "Once the taxpayer makes an elective choice, he is struck with it." *Roy H. Park Broadcasting, Inc. v. Commissioner*, 78 T.C. 1093, 1134 (1982). This is particularly true where an election is affirmatively made in a timely filed return and where the benefits of the election are reflected on the return as prepared and filed by the taxpayer. See *Goldstone v. Commissioner*, 65 T.C. 113 (1975); *Estate of Stamos v. Commissioner, supra*; *Estate of Wilbur v. Commissioner*, 43 T.C. 322 (1964); *Reaver v. Commissioner*, 42 T.C. 72 (1964).

Furthermore, the Tenth Circuit, the circuit to which this case would be appealable, has adopted and applied the doctrine of election in Federal tax controversies. See *Estate of Darby v. Wiseman*, 323 F.2d 792 (10th Cir. 1963); *Ackerman v. United States*, 318 F.2d 402 (10th Cir. 1963); *Keeler v. Commissioner*, 180 F.2d 707 (10th Cir. 1950), affg. 12 T.C. 713 (1949).

A limited number of exceptions to the doctrine of election have been recognized and may permit taxpayers to revoke affirmative elections made on their Federal tax returns. Courts have recognized that a material mistake of fact may vitiate the binding nature of an election. *Roy H. Park Broad-*

*casting, Inc. v. Commissioner, supra* at 1134; *Meyer's Estate v. Commissioner*, 200 F.2d 592 (5th Cir. 1952). Fact situations in which elections were allowed in amended returns were described in *Goldstone v. Commissioner, supra,* as follows:

(1) The amended return was filed prior to the date prescribed for filing a return; (2) the taxpayer's treatment of the contested item in the amended return was not inconsistent with his treatment of that item in his original return; or (3) the taxpayer's treatment of the item in the original return was improper and the taxpayer elected one of several allowable alternatives in the amended return. [65 T.C. at 116.]

However, as was stated in *Estate of Stamos v. Commissioner, supra* at 474, mere —

Oversight, poor judgment, ignorance of the law, misunderstanding of the law, unawareness of the tax consequences of making an election, miscalculation, and unexpected subsequent events have all been held insufficient to mitigate the binding effect of elections made under a variety of provisions of the Code.

Applying the doctrine of election to the facts of the instant case, we find that petitioners in this case are bound by the affirmative elections that they made on their timely filed 1974 and 1975 Federal income tax returns.

In applying the two requirements of doctrine of election to petitioners' circumstances, the Court finds that both requirements are met. First, petitioners had a choice between the following two alternatives: (1) To calculate the deductions claimed on their tax returns with respect to their contributions of appreciated capital gain property under section 170(b)(1)(D)(iii) and section 170(e)(1), as they did; or (2) to calculate those deductions under section 170(b)(1)(D)(i), as they now wish to do.

Second, there was an overt act manifesting petitioners' choice to the Commissioner. Although petitioners did not file with their returns a statement describing in narrative fashion their elections, they affirmatively manifested the elections they made on their 1974 and 1975 tax returns by applying the arithmetic of sections 170(b)(1)(D)(iii) and 170(e)(1), that is by reducing the appreciation of the donated property by fifty percent and by computing the deductible ceiling for the charitable deductions at 50 percent of petitioners' adjusted gross income for each year.

Petitioners contend that their elections were based upon a mistake of fact and therefore that the doctrine of election does not preclude a change in the elections made on their returns. They argue that the mistake of fact occurred when they made their original elections based upon the specific gross income figures reflected on the returns, which gross income figures subsequently were changed on audit. They further argue that had they been confronted with the gross income figures as adjusted by respondent when they originally filed their returns, they would not have made the section 170(b)(1)(D)(iii) elections.

The tax effect of respondent's audit adjustments, however, on the charitable contribution deductions was attributable solely to items unrelated to those charitable contribution deductions. Where unexpected tax consequences arise solely due to unrelated audit adjustments, no material mistake of fact has occurred. See *Estate of Darby v. Wiseman, supra*; *Estate of Stamos v. Commissioner, supra.* The facts of the present case are clearly distinguishable from the facts in *Meyer's Estate v. Commissioner, supra,* where the court permitted the taxpayer to change an election because the taxpayer and the respondent has stipulated that there had been a material mistake of fact. Accordingly, the mistake of fact exception to the doctrine of election is not applicable in the instant case, nor is any other exception to that doctrine applicable.

We also reject petitioners' argument that the legislative history of the charitable deduction provisions of the Tax Reform Act of 1969 supports their claim that they have a right to revoke their elections. Regardless of whether the overall legislative intent of those provisions is to be viewed generally as expansive or restrictive, such legislative intent would provide no exception to the doctrine of election in this case. Petitioners made affirmative elections on their original returns, claimed the benefit thereof, and now cannot be allowed to change them.

Based upon the above analysis, petitioners may not revoke the elections under section 170(b)(1)(D)(iii) that they made on their 1974 and 1975 Federal income tax returns. In light of our disposition of this issue on the basis of the doctrine of election, it is not necessary to address respondent's alternative argu-

ment that the language in section 1.170A-8(d)(2), Income Tax Regs., precludes the elections being made anywhere but on the original return.

## Prepayments of Delay Rental

The second issue for decision is whether petitioners, who use the cash method of accounting, properly deducted prepayments of delay rental with respect to several oil and gas leases. Petitioners maintain that their tax treatment of prepayments of delay rental has been consistent and therefore that such treatment clearly reflects income.

Respondent contends that petitioners' method of accounting with respect to prepayments of delay rental was improper, that petitioners have not been consistent in their treatment of those items, and that, as a result, there were material distortions of income that violate the clear reflection of income requirement of section 446(b). Additionally, respondent contends that the prepayments of delay rental involved herein were the equivalent of voluntary, nondeductible advance deposits, and that they do not qualify as ordinary and necessary business expenses. The Court agrees with respondent's determination that these prepayments do not satisfy the ordinary and necessary requirements of section 162.

The decided cases do not explain in a uniform manner the test to be utilized in evaluating the deductibility of prepaid items by cash method taxpayers. As was stated by the Eighth Circuit in *Keller v. Commissioner*, 725 F.2d 1173, 1177 (1984)—

"There is clearly no common thread or governing principle which rationalizes and renders predictable the results concerning deductibility of advance payments in general." [Quoting from *Mann v. Commissioner*, 483 F.2d 673, 676 (8th Cir. 1973).]

The different explanations of the test to be applied to the deductibility of prepaid items which are found in the court decisions[6] may be partially attributable to the fact that some

[6]Some of the cases refer to a three-part test of (1) deposit versus payment, (2) ordinary and necessary, and (3) clear reflection of income. See *Clement v. United States*, 217 Ct. Cl. 495, 503, 580 F.2d 422, 426 (1978), cert. denied 440 U.S. 907 (1979); *Frysinger v. Commissioner*, T.C. Memo. 1980–89 (39 T.C.M. 1287, at 1290, 49 P.H. Memo T.C. par. 80,089, at 80–465), affd. 645 F.2d 523, 525 n. 2 (5th Cir. 1981). Other decisions refer to either a variant of the three-part test to a two-part test of (1) deposit versus payment, and (2) clear reflection of income. See *Keller v. Commissioner*, 79 T.C.

of the cases arise primarily under the general provisions of section 162(a) and section 446(b);[7] while other cases concerning the deductibility of prepaid items arise not only under the general provisions of sections 162(a) and 446(b) but also under the authority of other Code provisions enacted to provide special tax treatment to specific types of expenses—for example, section 263(c) pertaining to intangible drilling costs,[8] and sections 1.471–6 and 1.162–12, Income Tax Regs., pertaining to cattle feed expenditures.[9] With respect to these latter expenditures, the special tax treatment given to them appears to be directed primarily at providing ordinary expense treatment where capitalization would otherwise be required. Although the Eighth Circuit in *Keller v. Commissioner, supra* at 1177, noted that "different policies do not mandate a different frame of analysis" for purposes of determining the deductibility of prepaid items, we express no opinion herein as to what test is appropriate for determining the year in which such prepaid expenditures may be deducted.

This case concerns the deductibility of prepaid items solely under the authority of section 162 and section 446(b). Where the deductibility of prepaid items is based on those sections, we believe the test to be applied is clear and relatively straightforward. It is a three-pronged test and is based on well-established Federal tax principles which generally are applicable to deductions claimed by cash method taxpayers. Each test is independent and must be satisfied.

*The first requirement.*—The first requirement is that there must have been an actual payment of the item in question. A mere refundable deposit will not support a current deduction. Section 162(a)[10] allows a deduction for all otherwise qualifying

7, 28 (1982), affd. 725 F.2d 1173, 1177 (8th Cir. 1984); *Van Raden v. Commissioner,* 71 T.C. 1083, 1097 (1979), affd. on other grounds 650 F.2d 1046 (9th Cir. 1981).

[7]See *Keller v. Commissioner,* 79 T.C. 7, 48–50 (1982) (with respect to management fees); *Bonaire Development Co. v. Commissioner,* 76 T.C. 789 (1981), affd. 679 F.2d 159 (9th Cir. 1982) (management fees); *Williamson v. Commissioner,* 37 T.C. 941 (1962) (delay rental similar to that involved herein); *University Properties, Inc. v. Commissioner,* 45 T.C. 416 (1966), affd. 378 F.2d 83 (9th Cir. 1967) (prepaid rent).

[8]*Keller v. Commissioner, supra; Jolley v. Commissioner,* T.C. Memo. 1984–70.

[9]*Clement v. United States, supra; Van Raden v. Commissioner, supra; Frysinger v. Commissioner, supra.*

[10]Sec. 162(a), in pertinent part, provides—

SEC. 162(a). IN GENERAL—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

expenses "paid or incurred" during the taxable year. A cash basis taxpayer must actually and irretrievably pay the expense during the taxable year in order to be entitled to a deduction under section 162(a). If the taxpayer retains the unilateral power to require a refund of the money or to redirect its use, the transfer is considered a mere deposit and a deduction is not allowed in that year. *Keller v. Commissioner*, 725 F.2d at 1177–1178; *Schenk Commissioner*, 686 F.2d 315, 319 (5th Cir. 1982); *Mann v. Commissioner*, 483 F.2d 673, 678 (8th Cir. 1973), *Ernst v. Commissioner*, 32 T.C. 181, 186 (1959).

*The second requirement.*—The second requirement is that there must have been a substantial business reason for making the prepayment in the year in which it was made. If the prepayment occurred simply to accelerate a tax deduction, no deduction will be allowed in the year of prepayment. This requirement is also based on section 162(a). Unless the prepayment of an item is for a valid business purpose, and not solely for a tax reduction, it "cannot fairly be characterized as an ordinary and necessary business expense" of the year of prepayment. *Keller v. Commissioner*, 79 T.C. at 48–50 (no business purpose for prepayment of management fees); *Stice v. United States*, 540 F.2d 1077, 1081 (5th Cir. 1976) (no business purpose in light of slight business benefit received); *Mann v. Commissioner*, *supra* at 680 (business purpose where protection from future price fluctuations was obtained by prepayment); *Bonaire Development Co. v. Commissioner*, 76 T.C. 789, 795 (1981), affd. 679 F.2d 159 (9th Cir. 1982) (no business purpose for prepayment of management fees); *Williamson v. Commissioner*, 37 T.C. 941 (1962) (no business purpose for prepayment of delay rental).

*The third requirement.*—The third requirement is that prepayment of the item in question must not cause a material distortion in the taxpayer's taxable income in the year of prepayment. This requirement is based on section 446(b)[11] which provides that—

---

[11]Sec. 446(a), sec. 461(a) and sec. 1.461–1(a)(1), Income Tax Regs., also provide general tax accounting rules which are applicable to the proper time deductions may be claimed and satisfaction with those rules may be in issue in connection with this third requirement.

Sec. 446(a) provides—

SEC. 446(a). GENERAL RULE—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

SEC. 446(b). EXCEPTION.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

Respondent's authority under section 446(b) reaches not only taxpayer's overall method of accounting but also taxpayer's treatment of specific items of income and expenses (sec. 1.446–1(a), Income Tax Regs.; *Keller v. Commissioner*, 725 F.2d at 1179; *Burck v. Commissioner*, 533 F.2d 768, 773 (2d Cir. 1976); *S. Garber, Inc. v. Commissioner*, 51 T.C. 733 (1969)), and there is a heavy burden on the taxpayer to overcome respondent's determination under section 446(b) that taxpayer's method of accounting does not clearly reflect income. *Keller v. Commissioner*, 79 T.C. at 38.

The facts in this case must be analyzed in light of the above three requirements. The prepayments by petitioners of delay rental, at the time of prepayment, effected either an extension or renewal of the leases. No provision of the leases entitled petitioners to a refund of the prepaid delay rental. Accordingly, we find that the prepayments did not constitute mere deposits but irretrievable payments which satisfy the first requirement.

The issue of whether the prepayments of delay rental involved herein satisfy the second requirement is controlled by our prior opinion in *Williamson v. Commissioner, supra.* That case involved facts essentially identical to those involved herein and disallowed the deduction of prepaid delay rental on

---

Sec. 461(a) provides—

SEC. 461(a). GENERAL RULE—The amount of any deduction or credit allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income.

Sec. 1.461–1(a)(1), Income Tax Regs., in pertinent part, provides—

Sec. 1.461–1. General rule for taxable year of deduction.
(a) *General rule*—(1) *Taxpayer using cash receipts and disbursement method.* * * * If an expenditure results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year, such an expenditure may not be deductible, or may be deductible only in part, for the taxable year in which made. * * *

We express no opinion herein as to this Court's acceptance of the Ninth Circuit's recent interpretation of the 1-year rule of the above regulation. See *Zaninovich v. Commissioner*, 616 F.2d 429 (1980), revg. 69 T.C. 605 (1978), and *Commissioner v. Van Raden*, 650 F.2d 1046, affg. on other grounds 71 T.C. 1083 (1979).

the ground that the prepayment did not qualify as an ordinary and necessary business expense in the year of prepayment.

The taxpayers therein made a prepayment on December 27, 1956, of delay rental with respect to an oil and gas lease, which delay rental was not due until March 1, 1957. Although the taxpayers offered evidence that similarly situated taxpayers had made delay rental payments from 30 to 60 days in advance to secure their leases, we found that there was an insufficient business reason for the prepayment of delay rental in 1956 where it was not due until the following year. The Court noted: "The facts in the instant case show no reason for petitioner's payment in 1956 of an obligation which would not arise until 1957 and fail to show that such payment constituted an ordinary and necessary business expense in 1956." *Williamson v. Commissioner, supra* at 945.

Similarly, here, while there was a legal obligation to pay the delay rental on a periodic basis in order to obtain renewals of the leases, petitioners had no obligations to make delay rental payments in December when the lease renewal dates did not occur, and payment of the delay rental was not due, until February or March of the following year. Petitioners argue that the prepayments of delay rental were made in order to secure their rights under the leases. This argument is unpersuasive with respect to the prepayments in issue. The general practice of petitioners for all other months was to make the delay rental payments 1 month in advance. Such practice with respect to the delay rental due in February or March of each year in issue would have secured petitioners' rights under the leases. No reason or business necessity was offered by petitioners herein to explain why it was necessary to prepay 60 to 90 days in advance the delay rental due in February or March of the following year.

Petitioners argue that *Williamson v. Commissioner, supra,* is distinguishable on the grounds that the taxpayers therein, in years prior to those at issue in that case, had not prepaid delay rental and therefore could not establish a record of consistency. That argument appears to be based on the premise that consistent treatment of prepaid items may override the requirement that the prepayments be ordinary and necessary. We reject this argument because, as previously explained,

consistent treatment of an item relates to the third requirement.

Based upon the above authorities, the prepayments of delay rental which are in question herein do not satisfy the ordinary and necessary requirements of section 162.

In light of petitioners' failure to satisfy the second requirement, it is not necessary to apply the third requirement to the facts of this case.

Because of the outstanding issue concerning the proper deduction for depletion allowance,

*Decisions will be entered under Rule 155.*